[Civ. No. 17560. Second Dist., Div. Three. Apr. 20, 1951.]

FRANK W. CHAMBERS et al., Appellants, v. DUANE
SILVER, Respondent.

Walter T. Casey, Albert L. Casey, Bodkin, Breslin & Luddy and Peter E. Giannini for Appellants.

Spray, Gould & Bowers and Malcolm Archbald for Respondent.

WOOD (Parker), J.—Action for damages for personal injuries and for wrongful death resulting from an automobile collision. Plaintiffs appeal from a judgment, entered upon a verdict, in favor of defendant.

The collision occurred on Monday, December 30, 1946, about 7 a.m., on a highway known as a "cut off" which was near Palmdale. The pavement was 24 feet wide and was made of asphaltic concrete. There was a white line in the center of the pavement. Each shoulder was 12 feet wide and unpaved.

Defendant was driving his 1936 Ford sedan automobile easterly on the south half of the highway until he arrived at a point which, according to his testimony, was about 75 feet from the place where the collision occurred. At that point his automobile went upon the north half (wrong side) of the highway, collided with a Packard automobile which was being driven westerly on the north half of the highway by plaintiff Frank W. Chambers, and then defendant's automobile continued across the north half of the paved highway and turned upside down on the north edge of the shoulder. The point of impact was near the north shoulder.

As a result of injuries received in the collision, Mrs. Pearl S. Chambers, the wife of Frank W. Chambers, who was a passenger in the automobile driven by him, died within a few hours after the collision. Mr. Chambers and his daughter-in-law, Mrs. Rae M. Chambers (a plaintiff), were severely injured in the collision. Also, as a result of the collision, Robert Hines, who was a passenger in the automobile driven by defendant Silver, died. The defendant was injured in the collision.

The right side of the front of the Ford was smashed in the collision. The Ford was towed to a garage in Palmdale, a distance of 5 miles, by a tow car. Photographs, which were taken at the garage and received in evidence as defendant's Exhibits A and B, show that the tow hook (which was at the end of the tow cable) was attached to the left side of

the front spring of the Ford, and that the front end of the Ford was suspended by the tow cable which extended through a pulley on the crane of the tow car. While the Ford was being towed from the scene of the collision, with the tow hook so attached to the left side of the front spring, the front end of the Ford (including the front wheels) was held "up" from the ground. The automobile mechanic who towed the Ford to his garage testified that after he had backed the Ford into the yard at the garage he observed that the left side of the main leaf of the front spring was broken; that he noticed it "because it was suspended down, still hanging on the tow truck"; that about three-fourths of the break was rusty and the other part was a new break.

At a place on the south side of the pavement, about 75 feet from the point of collision, there was a patch of hard substance which appeared to be clay or sand that had been washed by rain from a small embankment at the side of the road. The patch or substance was in the form of a small alluvial fan and was about 2 inches high at the south shoulder of the highway.

On the day of the accident, defendant left Los Angeles about 5:30 a.m., intending to return to Muroc where he, a mechanical engineer, serviced airplanes. He had traveled the road involved here twice a week for four months. It was his custom to spend week ends in Los Angeles. He testified that as he approached the scene of the accident he was traveling slightly under 45 miles per hour, and he saw a "clay patch" on the south side of the pavement; there was no sharp bump or roll on the patch, and he did not pay much attention to it; he "had driven over that sort of thing many times before in that country"; that as the right front wheel hit this clay patch his car suddenly veered to the left at quite a sharp angle, and he swung to the left across the center line, and as he kept on going to the left he "twisted the wheel as far as" he could but "there was no reaction to the car," and then the collision occurred; that the car went to the left of its own accord; that when the car went to the left, Mr. Chambers' car was very close and, since defendant's car was not responding to his efforts to turn it, he (defendant) tried to get across the road as fast as he could to get out of Mr. Chambers' way. His counsel asked him if he tried to control the Ford. He replied that after the car swung to the left he attempted to swing it farther to the left in order to put

it directly across the road, but nothing happened—there was no reaction to the wheel whatsoever. He also testified that on Sunday night (the night before the accident), while he was in Los Angeles, he believed that he and a friend went to a neighborhood tavern and had a bottle of beer; he returned home about midnight and went to bed soon thereafter; he got up about 5 a.m., Monday, and started to Muroc about 5:30 a.m.; and that he did not remember what he did on the Saturday night preceding the accident.

It was not asserted by pleading or at all that there was contributory negligence on the part of any plaintiff. The theory of the defense was that when the right front wheel of defendant's Ford hit the clay patch the left side of the main leaf in the front spring broke, and by reason thereof the automobile could not be steered or controlled.

Plaintiff Mr. Chambers testified that when the approaching Ford automobile was about 200 feet away he saw it start to come over to the left side of the highway; it seemed to keep cutting or edging over a little bit at a time; the Ford came over on the wrong side of the highway gradually; he did not notice a sharp cut-across by the Ford; that as the Ford kept edging over on the north side of the highway he (Mr. Chambers) edged over onto the north shoulder; that the last he could remember as to the position of the Ford was that it "was clear across the highway out into the brush with the wheels up."

A witness, called by defendant, testified that he is a chemist, metallurgist, and teacher of science; he had done quite a bit of consulting work in the field of investigating the causes of breaks in metals; he examined the spring involved here in April, 1947; he observed the break in the spring, and a little over one-half of the break was rusty looking and the remaining portion was bright looking; he sawed a piece out of the spring at the place thereon where he observed the break and made a chemical and microscopic analysis of the piece; it was a normal piece of steel as far as chemical composition was concerned; that in his opinion the origin of the old break was a very tiny fatigue fracture. He testified further that he had studied physics; that, with reference to the old crack in the spring, it would take very little force to cause the spring to crack the rest of the way, the remaining portion of the spring was approaching the death mark of old age in the last 100 miles of driving; that in his opinion the

driving of the right wheel of an automobile over the clay patch (shown in Exhibit 1) at 45 miles per hour would be sufficient to cause a complete and final rupture of what was left of the spring.

Mr. Harmon, called as a witness by defendant, testified that he had been in the business of repairing automobiles since 1929. Counsel for defendant asked him if he had had experience with a 1936 Ford to determine what happens as far as the steering of it is concerned when weight is shifted from one side to the other. He replied that the only experience he had "was to pick up a car one time and try to steer it back to the shop, that had a broken shackle on" one side of the spring. Counsel for defendant then asked him what the effect of the broken shackle was. He replied, "Very definite." Then counsel for defendant asked him what effect the broken shackle had so far as distributing the weight of the Ford to one side or the other is concerned. Counsel for plaintiffs asked counsel for defendant if he was talking about another case. Counsel for defendant replied to the effect that he was talking about another case. Counsel for plaintiffs objected to the question on the ground that "it is irrelevant, some other car. We don't know what else may have been wrong with it." The court overruled the objection, and the witness said, "I was just trying to simulate a similar condition." Counsel for defendant said: "With respect to this car with the shackle that you mention, did you observe what that did with respect to leaning the car one way or the other?" The witness replied: "The front end of the car dropped down on the wheel, or very close to the wheel, so it would not steer easy." Counsel for defendant asked him what experience he had had in connection with a 1936 Ford so far as knowledge of the spring and steering mechanism is concerned. He replied: "I have gone out to pick up cars and I have also tried to steer cars after they were in a garage for repairs that have been let down on one side through a faulty shackle bolt, or something bends in there, and it is nearly impossible to steer them."

Counsel for defendant then referred to a front assembly of a Ford—particularly the steering mechanism and front spring—which assembly had been brought into the courtroom by plaintiffs, and he asked the witness what happens to "this assembly" when that main spring leaf breaks. He replied that the weight of the car alone would cause "it to rotate, or

swing free on this side.'' Counsel for defendant then asked: ''Would anything happen with respect to this drag-link when that spring broke?'' He replied, ''Yes, there would be no control. Inasmuch as you have an anchor here and an oscillating movement there which is not anchored,—this front end depends on those points to be solid. You could turn this part one way or the other and you would not get any response on the steering mechanism.'' The examination of said witness was continued to the next day, and then counsel for defendant asked the witness: ''What effect would the spring breaking have upon the ability of a person to maintain the direction of the wheels, from a steering position?'' Counsel for plaintiffs objected to the question upon the ground the witness was not qualified to answer. The objection was overruled, and the witness said: ''It does not look like you would have any control over it at all for a moment, but there would be a time a few seconds, or even a minute later where a driver may be able to stabilize the car, bring it back under control. Everything would have to settle back to an assumed position, or whatever position it would take, after the spring broke. But for a moment, I do not believe anybody could control the car. One other point I left out yesterday.'' Counsel for defendant asked about the possibility of the left fender coming in contact with the tire of the left wheel if the left spring breaks. He replied that the tire would hit the fender and ''if that fender had any control over the wheel, more control that the steering mechanism, it would override anything a person could do to control the steering.'' On cross-examination, counsel for plaintiffs asked him if he had driven a car that had a broken spring. He replied: ''I have driven cars where the back spring has been broken . . . but I have never been able to drive a car with this particular suspension with a broken spring.'' He also testified on cross-examination as follows: ''Q. You will say then, it is a physical impossibility to steer this car without the spring being on it? A. Absolutely. Q. If the spring is on the car and one shackle is loose, you can still steer the car? A. No. Q. You also state that would be a physical impossibility? A. I will say you can steer the car, but you wouldn't have control over it.''

There was evidence on behalf of plaintiffs and defendant to the effect that the front end assemblies of 1936 and 1938 Fords, including the steering mechanism, are very similar. Witness Harmon, who was called as a witness by defendant as above stated, also testified that ''if the same thing would

happen to any of these models [referring to models of 1935 to 1938, inclusive], you would have similar results"; that a broken spring or an unfastened shackle upon a 1936 Ford would have the same effect upon the steering and control of the automobile.

A witness, called by plaintiffs, testified that within the week preceding the trial he drove a 1938 Ford automobile with the left front shackle of the spring unfastened, over a road where there were curves to the right and left, at a speed between 45 and 50 miles per hour, and that he did not have any difficulty whatsoever in driving the car and he was able to guide it; that in said experiment he drove the car more than 10 miles. Then counsel for plaintiffs asked him the following questions, and he gave the following answers: "Q. Now with the same car in the condition last mentioned, did you put any other additional obstruction in the path of the car, to drive over? A. Yes, sir. Q. What obstructions did you put in the path? Just describe them first. A. I put two 2 x 4's. Q. Were those two 2 x 4's each on the same side so that the left or right wheels, whichever it might be, would run over them, or was one put on one side and one on the other? A. One on one side, and one on the other. They were staggered. Q. Did you have a 2 x 4 for both the lefthand wheels and the righthand wheels to run over? A. Yes, sir. Q. How many did you have on each side? A. One." Thereupon counsel for defendant objected "to any further questioning in regard to this demonstration on the ground that it does not in any manner resemble the conditions present in the accident." The objection was sustained. Counsel for plaintiffs stated that the purpose of the testimony was to show the stability of a Ford with the front shackle unfastened, and that these conditions are more extreme conditions and they will show better the stability of the car. Counsel for defendant objected "to the proposed additional fact to the alleged demonstration on the ground that it does not compare in any manner with the conditions that occurred at the time of the accident." Counsel for plaintiffs said that plaintiffs had put something in the experiment which they thought was worse than a sand patch. The objection was sustained.

Two other witnesses, called by plaintiffs, testified that they rode in the automobile with the witness last above mentioned while he was making the experiment with the left front shackle unfastened, and that they did not notice anything wrong about the handling of the car.

One of appellants' (plaintiffs') contentions on appeal is that the trial court erred prejudicially in sustaining ·defendant's objection to evidence offered by plaintiffs regarding a demonstration with a 1938 Ford, whereby the operator of the Ford drove each front wheel, at different times, over a 2 x 4 board at a speed between 45 and 50 miles per hour while the left front spring shackle was unfastened. As above shown, the court permitted defendant's witness, over the objection of plaintiffs, to relate experiences of the witness in unsuccessfully attempting to drive Ford automobiles (not involved here) which had a broken shackle on one side of the spring. As to one of such experiences, the witness said the front end of the car dropped down so that the car would not steer easily and, as to other experiences, he said it was nearly impossible to steer the cars. The witness had stated also, on the first day he testified, that if the spring broke ''there would be no control,'' and ''you would not get any response on the steering mechanism,'' and the tire would hit the fender and it would ''over-ride anything a person could do to control the steering.'' It does appear, however, that when he testified on the second day he qualified his statements of the previous day by saying, ''It does not look like you would have any control over it at all *for a moment,* but there would be a time a few seconds or even a minute later where a driver may be able to stabilize the car, bring it back under control. . . . *But for a moment* I do not believe anybody could control the car.'' He also said that was *''One point I left out yesterday.''* Thereafter, on cross-examination, he stated: ''I have never been able to drive a car with this particular suspension with a broken spring''; and it is ''Absolutely'' a physical impossibility to steer the car without the spring on it; and if the spring is on the car and a shackle is loose the car could not be steered, and ''I will say you can steer the car, but you wouldn't have control over it.'' Also, the defendant had testified that despite his efforts to steer and control the automobile, after one leaf (the main leaf) in the spring had broken, it could not be steered or controlled at all. The defendant's excuse for being on the wrong side of the highway was based solely upon a claim that the breaking of a leaf in the spring so affected the steering mechanism that, by reason of such mechanical defect, it was impossible to steer or control the automobile.

The case presented several close questions. It was a close question as to whether the small clay patch was of such significance that running upon it with the right front wheel

would break the left side of the front spring. There was testimony that defendant had driven over many such patches in that country, and he did not pay much attention to the patch. Even if it could be found that such a patch could break the spring, it was a close question as to whether the patch did cause the break. The break was not noticed until after the wrecked Ford was at the garage. The Ford had been in a terrific head-on collision with a Packard, and the front end of the Ford was smashed. The Ford had been towed 5 miles with the tow cable hooked on the left side of the front spring, and with such cable so attached and extending through a pulley on the crane of the tow car the front end of the Ford was suspended or held "up" while it was being towed. The evidence showed that the cable so attached to the left side of the spring lifted the front wheels off the ground. It thus appears that it was a close question whether the spring was broken by reason of (1) the small clay patch, or (2) the terrific collision, or (3) towing the Ford, and suspending the front end of it, with a cable attached to the front spring. Also, even if it be assumed that the clay patch did cause the spring to break, there was a close question as to whether the automobile could then be steered or controlled. In view of (1) the several close questions involved in defendant's explanation of his presence on the wrong side of the road, (2) the several statements on behalf of defendant that the automobile could not be steered or controlled, (3) the court's ruling permitting defendant's witness to relate his experiences in unsuccessfully attempting to drive Fords which had a broken shackle, and (4) the fact that no plaintiff was negligent, it was highly important that plaintiffs have a full opportunity to present rebuttal evidence. In sustaining defendant's objection to evidence offered by plaintiffs regarding the above-mentioned demonstration in which the wheels of a Ford were driven over 2 x 4 boards, the plaintiffs were deprived of a fair trial and the court erred prejudicially.

 In regard to said demonstration, respondent asserts, among other things, that no question was asked to elicit the specific answer as to what was experienced with reference to driving over the 2 x 4 boards. It is to be noted (1) that, immediately after plaintiffs' witness said in effect that such a demonstration had been made with 2 x 4 boards, counsel for respondent (defendant) objected "to any further questioning in regard to this demonstration," and (2) that the

objection was sustained. Of course, after such ruling, it was not to be expected that plaintiffs' counsel would ask a further question to elicit a specific answer as to the result of the experiment. Respondent also asserts that since plaintiffs made no offer of proof as to what was experienced by such demonstration, this court will not assume what the answer would have been regarding the result of the demonstration. An offer of proof was not required. As above shown, the court sustained the objection "to any further questioning in regard to this demonstration." It is clear that it was the purpose of the court to exclude any further evidence regarding the demonstration. In *Heimann* v. *City of Los Angeles,* 30 Cal.2d 746, it was said at page 757 [185 P.2d 597], that defendant's objection was sustained to the entire line of proof sought to be introduced and "This being so, it cannot be held that the offer was insufficient or that a more specific offer was a prerequisite to review on appeal." In *Westman* v. *Clifton's Brookdale, Inc.,* 89 Cal.App.2d 307 [200 P.2d 814], it was said at page 314: "When a trial court states or otherwise indicates . . . that it will not receive evidence, a specific offer of proof is not necessary." (See *Estate of Kearns,* 36 Cal.2d 531, 537 [225 P.2d 218].) It is to be noted that counsel for respondent stated in his brief that "By the direct testimony of the witness and by the statements of plaintiffs' counsel above quoted in arguing the objection, no doubt was left in the minds of the jury that Mr. Chambers [the witness, son of plaintiff Frank Chambers] had driven over these 2 x 4's in connection with his experiment." From the questions of plaintiffs' counsel pertaining to the manner in which the boards were placed for the demonstration, which questions preceded defendant's objection to further questions, and from plaintiffs' argument (after the objection had been made) to the effect that the boards made a more extreme or "worse" condition for a demonstration than the sand patch, it is obvious that the testimony with respect to the result of the demonstration was material, and would have been favorable to plaintiffs, and would have been in rebuttal of evidence received on behalf of respondent. Where a question to which an objection is sustained indicates that the answer to it will be favorable to the party seeking to introduce the testimony and where the question is a material one, it is not necessary to make an offer of proof. (See *Sumida* v. *Pacific Auto. Ins. Co.,* 51 Cal.App.2d 472, 478 [125 P.2d 87]; and *Stroud* v. *Hansen,* 48 Cal.App.2d 556, 560 [120 P.2d 102].)

By reason of the above conclusions, it is not necessary to determine the other contentions of appellants.

The judgment is reversed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied May 15, 1951, and respondent's petition for a hearing by the Supreme Court was denied June 18, 1951. Edmonds, J., and Schauer, J., voted for a hearing.