Opinion
 

 LORING, J.
 
 *
 

 Charles M. Manson (Manson), Susan Denise Atkins (Atkins) and Bruce McGregor Davis (Davis) were indicted by the grand jury for the murder of Gary Allan Hinman (Hinman) on July 27, 1969, in violation of Penal Code section 187 (count 1); count II charged that Manson, Atkins and Davis entered into a conspiracy to commit murder and robbery on or about the “25th through the 28th day of July 1969 in violation of Penal Code section 182.1.” Three overt acts were alleged: (a) that on or about July 25, 1969, they “did travel to the vicinity of 964 Old Topanga Canyon Road, Malibu, in the County of Los Angeles” (b) on or about July 26, 1969, they entered the residence at the same address (c) on or about July 26, 1969, Manson and Davis “did drive away” from the same address in a Fiat automobile owned by Hinman. Count III of the indictment charged Manson, Davis and Steve Grogan (Grogan) with the murder of Donald Jerome (Shorty) Shea (Shea) “between the 16th day of August, 1969 and the 1st day of September, 1969” in violation of Penal Code section 187.
 

 The trial of Manson was severed from the trial of the other defendants.
 
 [1]
 

 Manson made a number of motions prior to or during the trial (all of which were denied): (1) to represent himself as his own lawyer or as cocounsel; (2) to disqualify the trial judge; (3) dismissal; (4) to plead once in jeopardy; (5) change of venue; (6) to sequester jury; (7) to
 
 *12
 
 exclude evidence. He also filed a demurrer to the indictment and challenges to the grand jury which were overruled.
 

 A jury was empaneled after 24 days of voir dire examination. After 43 trial days,
 
 [2]
 
 the jury returned guilty verdicts on counts I, II and III and fixed the penalty as imprisonment for life. Manson’s application for probation and motion for new trial were denied. Manson was sentenced to state prison for the term of life as prescribed by law on each count, but execution of sentence on counts II and III was stayed pending completion of sentence on count I. Manson appeals from the judgment.
 

 Facts
 
 [3]
 

 A.
 
 The Murder of Hinman
 

 Paul Piet, Los Angeles County Deputy Sheriff, testified that in response to a call from Michael Erwin he arrived at 964 Old Topanga Canyon Road in Malibu on July 31, 1969. He discovered the body of Hinman lying on the floor of the living-bedroom-type room. It was badly decomposed. Investigation disclosed a bullet hole in the kitchen cabinets. Near the body were Buddhist prayer beads known as “Jizu.” Blood was on the body and clothing and splattered around the inside of the house on the walls and furniture. Written in apparent blood on the living room wall were the words “Political Piggy” and a drawing that appeared to be like a paw print of an animal.
 

 An autopsy established that Hinman had been stabbed twice in the chest; that the cause of death was a stab wound through the heart. There was a large cut on the left side of the face through the left ear to the left lip of the mouth, which could have been caused by a sword.
 

 
 *13
 
 On and for some time prior to September 1, 1969, Manson was the leader of the so-called “Manson family.”
 
 People
 
 v.
 
 Manson, supra,
 
 61 Cal.App.3d 102, describes the composition, activities and modus operandi of the Manson family and need not be repeated here.
 

 A fingerprint of Beausoleil, who was a member of the “Manson family,” was found in Hinman’s house on a door frame between the kitchen and the hall. A nine millimeter bullet was recovered from under the sink which could have been fired from a nine millimeter Radom gun. Hinman’s Fiat station wagon was seen at the Spahn Ranch, where the Manson family lived,
 
 [4]
 
 on July 28, 1969, by Deputy Sheriff George D. Grapp and other officers.
 

 Beausoleil was found in the Hinman Fiat station wagon on Highway 101 in the San Luis Obispo area on August 6, 1969, by Forest J. Humphry of the Highway Patrol. Beausoleil was arrested. After Hinman’s Fiat was impounded, officers found a knife in the rear spare tire well under a rubber mat.
 

 Ella Jo Bailey testified for the People that she had known Manson since 1967 and travelled extensively throughout the southwestern United States with him, Mary Brunner, Patricia Krenwinkel and Lynne Fromme, and that they moved to the Spahn Ranch in 1968 where she met Davis and Beausoleil. Several times during May and June 1969, Manson talked to Bailey and others about “going out” to get money to buy dune buggies to go to the desert to live. In July of 1969 Manson talked to several members of the family about the need to get money and names were discussed of various persons from whom they could get money. Hinman’s name was discussed and the fact that he owned a house and stocks and bonds. On July 26, 1969, Manson told Bailey and Bill Vance that he wanted them to go to Hinman’s house and persuade him to join the “family” or sign over all of his property and automobiles. Vance said he had better things to do and walked away. That night at about 6 p.m. Bailey saw Manson talking to Beausoleil and Davis. Beausoleil had a knife (People’s exh. 18) and Davis had a nine millimeter Radom gun (People’s exh. 30). Subsequent investigation by officers established that Davis had purchased the gun under an assumed name. Bailey saw Brunner and Atkins dressed in dark clothes. Bailey saw Brunner, Atkins, Beausoleil and a fourth unidentified person drive off in
 
 *14
 
 a ranchhand’s car which was driven by the fourth person. Davis was still in the parking lot.
 

 Two nights later Bailey saw Brunner and Atkins drive up to the Spahn Ranch in a Volkswagen microbus which Bailey had previously seen in the possession of Hinman. Bailey went with Brunner in the microbus to a eucalyptus grove on the Spahn Ranch. Bailey observed that there was no key in the microbus and the ignition wires had been wired together. On the seat of the microbus Bailey saw a purse with $27.64 in it. With Bailey’s help, Brunner wiped off the microbus. The next morning Bailey saw Hinman’s Fiat station wagon at the Spahn Ranch. Later that morning Bailey saw Manson in the presence of about six other people carrying a sword. Bailey testified:
 

 “Charles [Manson] stated that after the phone call had come to the ranch asking for help,[
 
 5
 
 ] he and Bruce Davis had gone to Gary Hinman’s house, and he stated at the time that they arrived, Mary [Brunner] and Sadie [Atkins] and Bobby [Beausoleil] had gotten the gun back away from Gary Hinman.
 

 “He stated that he had words with Mr. Hinman, and they had a heated argument, and then it became necessary for him to quiet Gary Hinman down, and he stated that he used a sword and cut Gary Hinman from his left ear down to his chin. . ..
 

 “He also said that he had quieted Gary down, and the girls put Gary in bed, and that Mr. Hinman asked for his prayer beads and after that he said that he had left Bobby to finish up.. ..
 

 “He said that two or three shots had been fired at the house. He also said that Bobby was foolish to ever let Sadie hold the gun on Mr. Hinman. .. .
 

 “He said that all they had gained from going to Gary’s house were the two vehicles and around $27.”
 

 Alan Leroy Springer testified that he spent a night at the Spahn Ranch about August 10 or 11, 1969. In effect Manson tried to recruit him to join the family. Manson explained how they got things: “Well, we will go up to the door and knock on the door of their houses, and when they come
 
 *15
 
 to the door and open it up, .. . we’ll just do them in or stick them.. .. Everything behind the door is yours, then, ... for the taking.” Manson said that he had “whacked a guy’s ear off; ... a Hinman.” Manson said that he took Hinman’s truck away from him. Manson said: “Well, we cut this guy’s ear off’ and somebody asked “Who was that?” and Manson said “That was Hinman.”
 

 On August 10, 1971, while the instant case was on trial, during the testimony of Springer and. while the prosecutor and Manson’s lawyer were at the bench conferring with the judge, Manson who was seated at counsel table leaned over to Sergeant Paul J. Whiteley,
 
 [6]
 
 who was also seated at counsel table and said (according to Whiteley’s testimony): “Springer is lying. I’ve never met the man. He just jumped on.” Whiteley said: “I didn’t put you at the Hinman house. Mary Brunner did.” Whiteley then testified further:
 

 “And then Mr. Manson stated, ‘Sure, I went to Hinman’s house and got the gun and sliced his ear. I don’t deny that. I told Bobby [Beausoleil] how to stand up like a man. He had a woman’s thoughts. I told him what to do—no. [Interruption]...
 

 “Uh—T told him what to do. Hinman deserved to die. He was selling bad dope.’
 

 “And then there was a pause, and he said, ‘He was greasy.’
 

 “And that’s the end of the statement.”
 

 Whiteley’s testimony was corroborated by the testimony of Officer Clifford Patrick Blackburn who overheard the counsel table conversation between Manson and Whiteley except that Blackburn testified that Manson said:“...! held the gun on him, and—I told Bobby ... [Bobby Beausoleil]—to kill him. And I even showed him how to do it. . .. it wasn’t really a conversation. .. . Manson did all the talking.” When the court was trying to determine whether Manson’s statements to Whiteley were made voluntarily, Blackburn testified in chambers that about a week previously Manson had made a similar voluntary statement to Whiteley.
 

 
 *16
 
 When Manson testified
 
 [7]
 
 in support of a motion to suppress the testimony of Whiteley and Blackburn, he also corroborated the conversation stating: “In general Mr. Whiteley’s statements were right. . . He admitted going to Hinman’s house, that he took the gun away from the guy . . and I had to cut him.” and he requested the girls to stay there and clean the place up and clean Hinman up. Manson testified that he didn’t look at Whiteley as “anything but a brain that I could program. And I dropped a lot of information in his head that would be useful to me later on.” Manson testified that he talked to Whiteley “Eveiy chance I get.” Some of the conversations occurred in the presence of Manson’s lawyer. The court concluded that Manson’s statements to Whiteley were not solicited by Whiteley and that they were freely and voluntarily given by Manson for some purpose of his own, and that they were spontaneous. The court said that it had witnessed conversations between Manson and Whiteley at counsel table while Manson’s lawyer was seated between them.
 

 
 *17
 
 Marius John Arneson testified that in 1969 he lived at the Spahn Ranch, that he left the ranch and returned in late July or August 1969, that Beausoleil drove him and Manson in a white Fiat station wagon to look at a Volkswagen microbus which was on the Spahn Ranch, that Manson gave him Hinman’s Volkswagen microbus which had to be “hotwired” to drive, that Manson gave him a pink slip and instructed him that if he ever got in a hassle over the registration to say that he had gotten it from a Gary Hinman who was supposed to be a Black Panther.
 

 Brunner was called as a witness by the People. By means of prior inconsistent statements (a transcript of her testimony at the trial of
 
 People
 
 v.
 
 Beausoleil,
 
 supra),
 
 [8]
 
 the People established that in the latter part of July 1969, around midnight, Brunner, Beausoleil and Atkins were driven to Hinman’s house by Davis. Beausoleil asked Hinman for money. Hinman said he did not have any. Beausoleil pulled a gun. Beausoleil and Hinman got in a fight in the kitchen. Beausoleil hit Hinman over the head more than once with the gun. Hinman’s head was cut and bleeding. Beausoleil asked Brunner to clean up Hinman and gave Atkins the gun to hold on Hinman. Beausoleil went into the living room. Hinman took the gun away from Atkins. Beausoleil returned to the kitchen and resumed the fight with Hinman. During the struggle the gun discharged and a bullet went under the sink. Manson and Davis entered the house. Manson had a sword. Manson and Hinman struggled in the living room. Brunner was in the kitchen. Manson came into the kitchen with his finger cut. Brunner bandaged Manson’s finger and went into the living room where Atkins was bandaging Hinman’s ear. Hinman’s ear was cut in two and he had a cut running down his cheek. Manson and Davis left Hinman’s home in Hinman’s Fiat station wagon. Atkins, Brunner and Beausoleil stayed at Hinman’s house Saturday and Sunday for two days and nights. During this period Atkins answered the telephone and, using an English accent, told the callers that Hinman had gone to Colorado because one of his parents was sick.
 

 Jay Hofstadter and Richard Siegel testified that they telephoned the Hinman home. Hofstadter testified that he telephoned Saturday, July 26, 1969, that a female answered the phone and said that Hinman had gone back to Colorado because his parents had gotten in an automobile accident. The girl said she came from London. She spoke with a British
 
 *18
 
 accent. Siegel called on Sunday, July 27, 1969. Siegel testified to the same effect.
 

 Brunner’s prior testimony also established that during the two-day period that Atkins, Brunner and Beausoleil stayed at Hinman’s house, Hinman lay bleeding and sleeping. Atkins, Brunner and Beausoleil searched the house for things of value. They found “about twenty bucks” and two pink slips and two white slips to the cars. Beausoleil had Hinman endorse the pink slips. While Atkins and Brunner were in the kitchen, they heard a noise and rushed into the living room and Brunner found Beausoleil with a knife in his hand. Hinman had been stabbed. He was bleeding from the chest. They cleaned the place up obliterating fingerprints. Hinman went into a coma. Beausoleil said it was all over. Hinman then started breathing with a “loud raspy breathing.” Beausoleil put a pillow over Hinman’s head. He asked Brunner to hold it. Brunner did so for about two minutes and gave it to Atkins. They left Hinman’s house in his Volkswagen which they had to “hotwire.” Brunner took the nine millimeter Radom gun with her.
 

 B.
 
 The Murder of Shea
 

 Shea took care of horses and was a handyman who lived most of the time at the Spahn Ranch. Although he sometimes obtained temporary employment elsewhere, he always seemed to return to the Spahn Ranch. His ambition was to be an actor and stuntman in motion pictures. Shea owned a matched set of Colt .45’s which he carried in an attache case bearing the lettering “Reverend Donald Shea.” Shea was very proud of the Colt ,45’s stating that he would never sell them. However, when he needed money (which was frequently) he would pawn the guns but always for a small sum so that he would always be able to redeem them. Shea’s wife testified that she last saw Shea on August 16, 1969 (when they separated), and that that night at 7 or 8 p.m. he telephoned her and said he was at the Spahn Ranch and that he was going to stay there for a while. On August 17, 1969, Shea’s wife observed that Shea’s possessions including two suitcases
 
 and a footlocker had
 
 been removed from the hotel where they had previously stayed together. The footlocker had the words “Donald Jerome” stamped on the top. In a letter Shea told his wife if she wanted to contact him to call his long-time friends, the Babcocks, because they would always know where to reach him. Thereafter, Mrs. Shea called the Babcocks three times and as a result tried to telephone Shea at the Spahn Ranch several times during the period August 27, 1969, through September 1, 1969. On two occasions a female answered the telephone and said Shea had gone to San
 
 *19
 
 Francisco. Sharon Babcock testified that she attempted to telephone Shea at the Spahn Ranch three times. A female answered the telephone on each occasion.
 

 Robert Bickston testified that in May of 1969, he talked to Shea about employment in a motion picture which was to start around July 15, 1969. Bickston talked to Shea about the motion picture again in June of 1969 and told him they were getting close to the starting date and to keep in touch with Mrs. Bickston. The starting date was eventually postponed to September 15, 1969. That from 1957 (when Bickston first met Shea) through June 1969, they kept in periodic touch with each other about eveiy three weeks, never longer than six weeks. Bickston last saw Shea between the middle and end of June 1969, and had not seen nor heard from him since.
 

 Although Shea had previously worked for the Leslie Salt Company near San Francisco, he had not been employed by that company since September 5, 1968. Lance Victor who worked with Shea at the Leslie Salt Company and frequently visited him at the Spahn Ranch testified that he spoke to Shea at the Spahn Ranch in August 1969. Shea said he wanted to borrow money, that he wanted to return to work at the Leslie Salt Company. Shea was more nervous than usual. Shea was “kind of afraid.” Victor returned to the Spahn Ranch a few weeks later. Shea was not there.
 

 Jerry Binder, a close friend of Shea who frequently loaned him money which Shea always repaid, testified that he loaned Shea money in July 1969, which Shea never repaid, that prior to July or August 1969, Binder heard from Shea at least once a month and if Shea were going out of town, Binder was the first one he would tell.
 
 [9]
 
 Binder last talked to Shea (who was staying at that time at Binder’s home) at the end of July 1969.
 

 
 *20
 
 Frank Retz testified that he purchased a portion of the Spahn Ranch in 1967 or 1968 and thereafter negotiated with Spahn for the purchase of the remainder of the ranch. In June 1969, Retz arranged to purchase the Kelly Ranch adjoining the Spahn Ranch and on June 30, 1969, Retz entered the farmhouse and saw Manson and about 20 people lying on the floor. Retz ordered Manson off of his property. Retz called the sheriff. Retz saw Manson on the Kelly property frequently after June 30, 1969, and ordered him off the property. After June 30, 1969, Retz had several conversations with Spahn, many of which were overheard by “Squeaky” Fromme (a Manson family member) about getting Manson and his family off of the Spahn Ranch. Retz told Manson to leave the ranch because Spahn asked Retz to clean up the ranch of the Manson family and he gave Retz a power of attorney. Retz had conversations with Spahn about the presence of the Manson family on the Spahn Ranch in the presence of Fromme. About one week prior to August 16, 1969, Manson threw a knife at Shea which stuck in a door directly in front of where Shea was walking.
 

 Because of the activities of the Manson family, deputy sheriffs raided the Spahn Ranch on August 16, 1969. Retz told Spahn several times, four or five times, he wanted to hire a guard and on more than one occasion Fromme was present. Spahn told him to hire Shea, which Retz agreed to do. Retz told Spahn in the presence of Fromme that he wanted to keep “Manson and everyone” off of the property. Retz never saw Shea after he talked to Spahn about hiring him as a guard.
 

 Shortly after deputy sheriffs raided the Spahn Ranch on August 16, 1969, and arrested Manson, Manson was released from jail and returned to the Spahn Ranch.
 

 Barbara Hoyt, a member of the Manson family, testified that after his release from jail, Manson, in the presence of various people, said that Shea was responsible for the sheriffs raid, that Shea was an ex-policeman, that Shea was trying to get the Manson family kicked off of the Spahn Ranch and that Shea was an informant. Manson also said that Retz was trying to take over the Spahn Ranch, that when he did he would bring up a bunch of “Nazis” and kick the family off the Spahn Ranch, and that he got his information from Fromme.
 

 
 *21
 
 John Swartz, who was employed on the Spahn Ranch, testified that Manson told him after the August 16, 1969, raid by the deputy sheriffs that Retz had purchased one-half of the ranch from Spahn and had offered Shea a job as watchman, and that Shea was going down that night to see about it. Ten days or two weeks later Swartz asked Manson if he had seen Shea and Manson said Shea had gone to San Francisco.
 

 Manson and others were arrested again on Retz’ property on August 24, 1969, for possession of marijuana.
 

 Ruby Pearl worked on the Spahn Ranch. Pearl had known Spahn for 18 years and Shea for 15 years. She testified that Manson and members of his family came to the Spahn Ranch in the spring of 1969. In June of 1969, Shea told Pearl he had a part coming up in a motion picture which he was anxious to do. In the latter part of August 1969, “a couple of weeks” after August 16, 1969, Shea asked if he could come and stay at Pearl’s home. He was very nervous. Pearl had no place for Shea to stay except in a shed. Shea did not want to stay there. Pearl drove slowly away. As she drove away Pearl saw a car drive up “real suddenly.” Several Manson family members got out of the car. Pearl saw Manson, Watson, Grogan and Davis get out of the car and they spread out and approached Shea with Shea in the middle. When they were about five feet from Shea, Pearl drove out of sight. Pearl never saw or heard from Shea again.
 

 Hoyt testified that late one night in the latter part of August 1969, when she was going to sleep in the “parachute room,” she heard screaming. She heard many loud screams coming from down by the creek. She recognized the screams as coming from Shea. The screams occurred later that night. Hoyt never saw Shea again. The next afternoon when she was down by the creek, Hoyt overheard a conversation between Manson and Danny DeCarlo, in which Manson said “Shorty [Shea] committed suicide, with a little help from us. And we buried him under some leaves.” Manson said they cut him up in nine pieces and buried him under some leaves. Manson pointed down the creek with his thumb over his shoulder. Manson asked DeCarlo if lye or lime would get rid of the body. DeCarlo said lye would get rid of it; lime would preserve it. Manson asked DeCarlo where he could get some lye. That night Hoyt, Manson and most of the members of the Manson family left the Spahn Ranch and went to Barker Ranch and Meyers’ Ranch in the desert. Hoyt described their route of travel as through Ballarat and Goler Wash. At the Meyers’ Ranch, Manson in the presence of several members of the Manson family, told about the killing of Shea. Hoyt testified:
 

 
 *22
 
 “Charlie [Manson] said that they had killed Shorty [Shea], Uh, they cut him up in nine pieces.
 

 “And first they asked him—oh, they—they asked him if he would like to see something and, uh, that they had something that they wanted to show him. And then, he got into the dune buggy and they took him away. And then, they hit him in the head with a pipe. Uh, they pulled him out of the car, and they started stabbing him. And then, umm, they kept stabbing him and stabbing him.
 

 “And Charlie said—or Shorty said, ‘Why, Charlie, why?’
 

 “And Charlie said, ‘Why? This is why.’ And then, he stabbed him again.
 

 “And, uh, he said that it was—it was very hard to kill him until they brought him to now. And when they brought him to now, he said that Clem [Grogan] cut his head off.’’
 

 Brooks Poston testified that in September of 1969 at the Barker Ranch and Meyers’ Ranch, Manson in the presence of Davis, Watson and other members of the family said:
 

 “. ... You remember Shorty, don’t you? You know, we had to do him in. He was bad-mouthing the ranch and calling the Man [police] on us, and scheming with Frank Retz to get the ranch. And we warned him two or three times to stop, but he didn’t.
 

 “So we hit him on the head, took him for a ride. And when he started to come to, we stuck him with knives. And when he started to get to now, he was really hard to kill, because he wouldn’t give it up.
 

 “So Clem [Grogan] had to cut his head off.”
 

 Paul Watkins testified that on September 1, 1969, at the Barker Ranch, “He [Manson] said we had to kill Shorty. He said Clem [Grogan] cut his head off. And he said that he’s been bad-mouthing the ranch and that he knew too much about the Fountain of the World and so—that he was messing things up, up there. . . . He’s been calling the Man [police] on the ranch.” Manson said Clem cut Shea’s head off with a machete.
 

 Circumstantial evidence was produced by the prosecution to prove the murder of Shea because Shea’s body was never recovered. Such evidence
 
 *23
 
 consisted, inter alia, of the following: that Shea’s car was found on December 9, 1969, parked on a street in Chatsworth with Shea’s foot locker in the trunk of the car, keys underneath the front seat; shoes and papers were in the car; picture negatives were in the foot locker which Shea had agreed to return to Pearl; a fingerprint from Davis was on the foot locker; DeCarlo had redeemed Shea’s pair of Colt .45’s which Shea had pawned with Sam Launer, a Hollywood pawnbroker; DeCarlo had sold the guns to Delma Eugene Baker in Culver City.
 

 John Swartz testified that he had seen Vance and DeCarlo at the Spahn Ranch in possession of Shea’s attache case containing the Colt .45’s.
 

 In February 1970, Richard Davis Barber found Shea’s suitcase and briefcase under some brush in Goler Wash.
 

 A great mass of evidence was presented regarding efforts by law enforcement to locate Shea or his body. None of the efforts were productive.
 

 Issues
 
 [10]
 

 Appellant contends:
 

 1. As a preliminary overview, the conviction should be reversed because the case was close on the facts, the evidence (particularly regarding the Shea murder) was circumstantial and the state-inspired publicity tainted and interfered with the truth-seeking function of the trial.
 

 2. Massive publicity deprived appellant of due process of law.
 

 3. The grand jury indictment procedure is constitutionally infirm.
 

 4. There was no competent evidence to support the indictment and therefore the court should have granted appellant’s motion to dismiss under Penal Code section 995.
 

 5. For several reasons it was reversible error to receive in evidence the testimony of Brunner at a prior trial.
 

 
 *24
 
 6. The conviction of the Hinman murder should be reversed because of: (a) errors in connection with the testimony of Bailey, (b) state misconduct regarding testimony of Arneson, (c) the suppression of evidence regarding the testimony of Springer, (d) the introduction of Whiteley testimony, (e) the fact that the evidence was insufficient to sustain the verdict.
 

 7. The conviction of the Shea murder should be reversed because of: (a) the evidence (apart from Manson’s admissions) is insufficient to establish a corpus delicti, (b) the cumulative effect of numerous errors relating to the admissibility of evidence.
 

 8. The demurrer to count II of the indictment should have been sustained because of ambiguity which denied due process.
 

 9. Jurors were improperly excused from the petit panel.
 

 10. Appellant should have been permitted to represent himself under
 
 Faretta
 
 v.
 
 California
 
 (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], despite the fact that
 
 Faretta
 
 is not retroactive.
 

 Discussion
 

 1.
 
 The Preliminary Overview
 

 Manson devotes 33 pages of his opening brief to the evaluation of the evidence with reference to both the Hinman and Shea murders as if this appeal were a trial de novo, concludes that the evidence is close, and that the various errors complained of therefore were prejudicial and require reversal.
 
 [11]
 

 In our view, the major premise is erroneous. We do not agree that the evidence, viewed in the light most favorable to respondent, indicates that either case was close. In the Hinman case, the corpus delicti was established by direct evidence. Hinman clearly was murdered by someone. The totality of the evidence demonstrates that Hinman was killed in the course of a robbeiy. All of the participants in the robbery are therefore guilty of murder in the first degree (Pen. Code, § 189), even though only one struck the fatal blow.
 
 (People
 
 v.
 
 Sirignano
 
 (1974) 42 Cal.App.3d 794 [117 Cal.Rptr. 131].) In
 
 People
 
 v.
 
 Ulsh
 
 (1962) 211
 
 *25
 
 Cal.App.2d 258 [27 Cal.Rptr. 408], the court said (p. 266): “Furthermore, it is well established that if a homicide is committed by one of several confederates while engaged in perpetrating the crime of robbeiy in furtherance of a common purpose, the person or persons engaged with him in the perpetration of the robbery but who did not actually do the killing, are as accountable to the law as though their own hands had intentionally fired the fatal shot or given the fatal blow, and such killing is murder in the first degree.
 
 The jury has no option but to return a verdict of murder in the first degree whether the killing
 
 was
 
 intentionally or accidentally done, and it is proper to so instruct the jury.”
 
 (Italics in original.)
 

 Manson was clearly an aider and abettor, if not the primary instigator, of the robbeiy. By his own admissions he struck Hinman with a sword in aid of the robbery. The fact that Beausoleil was the person who struck the fatal blow does not relieve Manson of responsibility for the murder of Hinman. The evidence of Manson’s guilt for the Hinman murder was more than substantial beyond a reasonable doubt.
 

 In the Shea case the corpus delicti was established primarily by circumstantial evidence. As we hereafter note in more detail the law in California has been clearly established since
 
 People
 
 v.
 
 Scott
 
 (1959) 176 CaI.App.2d 458 [1 Cal.Rptr. 600] (cert, den., 364 U.S. 471 [5 L.Ed.2d 222, 81 S.Ct. 245]; rehg. den. 364 U.S. 944 [5 L.Ed.2d 376, 81 S.Ct. 462]; cert, den., 368 U.S. 849 [7 L.Ed.2d 47, 82 S.Ct. 81] that even in the case of first degree myrder, the corpus delicti may be established by circumstantial evidence. (See 1 Witkin, Cal. Crimes, § 91, p. 87.) The circumstantial evidence of the corpus delicti in the case at bar is far stronger than the evidence involved in
 
 People
 
 v.
 
 Scott, supra.
 
 In addition, in the case at bar, there is direct “ear witness” evidence of the actual murder of Shea. Hoyt testified to hearing screams by Shea, at what the juiy presumably concluded was the precise time of the murder. Such ear witness testimony was clearly admissible as direct evidence to establish the corpus delicti.
 
 (People
 
 v.
 
 Marchialette
 
 (1975) 45 Cal.App.3d 974, 980 [119 Cal.Rptr. 816].) In the
 
 Scott
 
 case, there was no direct evidence of murder. In the case at bar, there was some direct evidence of murder even though Shea’s body was successfully disposed of.
 

 In our view the totality of the evidence in the case at bar supports the jury’s verdict that Manson was guilty of the murders of both Hinman and Shea beyond a reasonable doubt and that neither case was a close case. Consequently, the various claims of error can be evaluated on their respective merits.
 

 
 *26
 
 2.
 
 Publicity and Due Process of Law
 

 Manson argues that state-inspired publicity particularly in connection with the Tate-LaBianca murders deprived him of a fair trial and due process of law in the Hinman-Shea case. The publicity in the various news media in connection with the Hinman-Shea murders was only a small fraction of the publicity in connection with the Tate-LaBianca murders. Both Hinman and Shea were obscure and unknown except to a small circle of friends. Neither was socially or otherwise prominent or a well-known motion picture actor as were some of the victims in the Tate-LaBianca case. In short, the Hinman-Shea cases were not as “newsworthy” as the Tate-LaBianca cases. These were some of the factors which the trial court and this court may consider in attempting to determine whether or not publicity deprived Manson of a fair trial.
 
 (People
 
 v.
 
 Sommerhalder
 
 (1973) 9 Cal.3d 290, 304 [107 Cal.Rptr. 289, 508 P.2d 289].) However, the court properly issued a gag order.
 

 Manson has attempted to impeach the verdict in the Hinman-Shea case by incorporating by reference the evidence of the publicity introduced in the Tate-LaBianca case. In
 
 People
 
 v.
 
 Manson, supra,
 
 the court concluded that the “massive” publicity there involved did not mandate reversal of that judgment. If the massive publicity in connection with the Tate-LaBianca case did not deprive Manson of a fair trial in that case, it is difficult to see how such publicity would deprive Manson of a fair trial in the Hinman-Shea case. This case did not go to trial until approximately six months after the conclusion of the Tate-LaBianca case. Any residual effect of the publicity relating to the Tate-LaBianca case would be extremely minimal if at all.
 
 (People
 
 v.
 
 Sommerhalder, supra.)
 

 As noted the voir dire examination of the jurors and alternate jurors consumed 24 trial days. Except in one instance (hereinafter noted in detail) when Juror Luster was replaced with an alternate, Manson does not indicate the identity of a single juror or alternate who was empaneled whose impartiality or objectivity was affected in any way by any publicity prior to or during trial. The voir dire examination discloses that prior to trial most of the prospective jurors never heard of either Hinman or Shea or their murders or Manson’s connection with their murders. Although many jurors had heard of the Tate-LaBianca case and that Manson had some connection with that case, all jurors who indicated any specific knowledge of the prior case or that it might have some effect on their thinking here were excused for cause. The court was extraordinarily liberal in sustaining challenges for cause.
 

 
 *27
 
 Manson complains that the jury was not sequestered during the 43-day trial. The sequestration of a jury rests on the sound discretion of the trial court, or the court may permit separation with a proper admonishment. (Pen. Code, § 1121;
 
 People
 
 v.
 
 Murphy
 
 (1973) 35 Cal.App.3d 905, 933 [111 Cal.Rptr. 295];
 
 People
 
 v.
 
 Moore
 
 (1962) 209 Cal.App.2d 345, 352-353 [26 Cal.Rptr. 36].) The jury was repeatedly and adequately instructed regarding reading or listening to the news media. Except in the one instance hereinafter noted, there is no evidence that the jury did not adhere to the court’s instructions. The jury was sequestered during deliberation.
 

 While the court was in a two-week recess during the trial in the instant case, a group of Manson’s followers allegedly robbed a gun shop at Hawthorne to obtain guns to “rescue” Manson by taking the judge and prosecutor hostage and such alleged action resulted in some additional publicity in the news media. Manson moved for a mistrial or in the alternative to sequester the jury. He also requested the court to conduct an evidentiary hearing to determine whether the additional publicity had any effect on the jury. The court conducted an evidentiary hearing. In response to the court’s question seven jurors or alternates indicated that they had inadvertently heard or read something about the robbery of the gun shop during the two-week recess. The court then conducted an intensive examination of each of the seven jurors individually in the absence of the other jurors.
 

 Juror Lillian B. Luster testified that while she was on a trip to Oakland and her husband was ill at home alone, her husband was involved in a situation, having no connection with the case at bar, where a girl was killed by a third person at the apartment house where Luster lived. The girl died in Luster’s living room. Luster read the news headline about the robbery of the gun shop and thinking that it might have some connection with the killing of the girl at her apartment house she read the entire article. Luster indicated she was afraid because of what happened at her home. Other jurors indicated that they “accidentally” saw a headline or heard something on the radio but each indicated it would have no influence on his or her state of mind or deliberations and that it had not prejudiced them against Manson. Manson’s lawyer appeared to be satisfied with the questioning by the court. Manson’s counsel stated positively that he had no further questions to ask of the jurors. Eight jurors testified that they had not heard or read anything whatsoever. The case at bar therefore is not unlike
 
 People
 
 v.
 
 Salas
 
 (1972) 7 Cal.3d 812 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832], wherein the court said (pp. 818-819): “.. . the jurors’ ignorance of the pretrial publicity is a very
 
 *28
 
 strong indication that defendant was not tried by a biased jury, [citation] Eight of the twelve jurors did not recall reading or hearing about the case and the recollection of the remaining four was so dim as to be negligible.” (Fn. omitted.)
 

 It is clear from the court’s interrogation of the jurors that some of the jurors had very slight knowledge of the news media stories about the Hawthorne gun shop robbery and that such slight knowledge had no effect whatsoever on their ability to sit in judgment fairly and impartially. The court denied the motion for a mistrial.
 
 [12]
 
 The court excused Juror Luster because she had read the news article in violation of the court order and because of her emotional state resulting from the killing at her apartment house. Even the removal of Juror Luster was over defendant’s objection.
 

 The question here is not whether or not there was derogatory publicity about Manson, but whether or not the individual jurors were aware of such publicity and, if so, whether or not it affected their ability to be fair and impartial and to give Manson a fair trial. Substantial evidence sustains the trial court’s findings that some of the jurors had minimal knowledge of such publicity, that such minimal knowledge was accidentally acquired but that such minimal knowledge did not affect their ability to be fair and impartial and to give Manson a fair trial. Our own independent evaluation confirms the conclusion of the trial court.
 
 (People
 
 v.
 
 Sirhan
 
 (1972) 7 Cal.3d 710, 730 [102 Cal.Rptr. 385, 497 P.2d 1121].)
 

 We have read the newspaper stories in evidence herein with reference to the Hinman-Shea case that were published prior to and during the trial in the instant case and we find nothing in such news
 
 *29
 
 stories which were not entirely factual regarding evidence produced and proceedings in court, with the sole exception of the gun shop robbery already referred to. For example, newspaper stories carried the details regarding the counsel table conversations between Manson and Whiteley
 
 (infra,
 
 p. 40) which Whiteley and others testified to in open court. Furthermore, it is noteworthy that in the case at bar the juiy imposed only life sentences whereas in the Tate-LaBianca cases the jury imposed death sentences. Here the jury deliberation began on October 21, 1971, and the jury did not return a verdict until November 2, 1971. During this period the jury requested a rereading of significant portions of the testimony. The record demonstrates that the jury acted conscientiously on the evidence and was not influenced by any publicity.
 

 Unlike
 
 Estes
 
 v.
 
 Texas
 
 (1965) 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628] and
 
 Sheppard
 
 v.
 
 Maxwell
 
 (1966) 384 U.S. 333 [16 L.Ed.2.d 600, 86 S.Ct. 1507], in the case at bar there was no flagrant departure from fundamental due process and the proper courtroom decorum was not upset by external influences. The news media were not out of control in the courtroom. Prejudice therefore will not be presumed. No prejudice in fact is shown.
 

 We conclude that publicity did not deprive Manson of a fair trial or of due process of law.
 
 (People
 
 v.
 
 Sommerhalder, supra, 9
 
 Cal.3d 290, 301.)
 

 3.
 
 The Grand Jury Indictment Procedure
 

 Manson argues that the grand jury indictment procedure used to bring Manson to trial is constitutionally infirm. Manson made the identical argument in the Tate-LaBianca case. The decision was adverse there.
 
 (People
 
 v.
 
 Manson, supra,
 
 pp. 165-166.) It is adverse here. No reason is shown here which would justify a different conclusion.
 

 If the grand jury indictment is not supported by substantial evidence, Penal Code section 995 affords an adequate remedy.
 

 4.
 
 Competence of Grand Jury Evidence
 

 Manson also complains that the grand jury first issued separate indictments for the Hinman and Shea murders and then used certified transcripts of the testimony in the two cases in order to combine counts for the two murders into one consolidated indictment. Manson contends that his section 995 motion to dismiss the grand jury indictment should have been granted because of such alleged impropriety. The procedure
 
 *30
 
 was proper and has been approved.
 
 (Stern
 
 v.
 
 Superior Court
 
 (1947) 78 Cal.App.2d 9, 14 [177 P.2d 308];
 
 People
 
 v.
 
 Busick
 
 (1939) 32 Cal.App.2d 315, 324 [89 P.2d 657];
 
 People
 
 v.
 
 Follette
 
 (1925) 74 Cal.App. 178, 189-190 [240 P. 502].) In
 
 Follette
 
 the court said: “.. . when the second indictment is returned by the same grand jury which found the original one, the grand jury may rely upon the evidence given on the hearing, which resulted in the return of the original indictment, and need not hear any additional testimony.” (P. 190.) Penal Code section 939.6 does not compel a different result because the grand jury heard sworn competent testimony.
 

 5.
 
 Admissibility of Brunner’s Testimony
 

 a. Were the foundational requirements satisfied?
 

 Manson fires a general barrage at the admissibility of the testimony of Brunner particularly the receipt of Brunner’s testimony in the case of
 
 People
 
 v.
 
 Beausoleil, supra,
 
 as prior inconsistent statements. The prosecution called Brunner as a witness and propounded to her many of the same questions propounded to her in
 
 Beausoleil.
 
 However, in the case at bar, contrary to her testimony in
 
 Beausoleil,
 
 Brunner denied going to Hinman’s house in July 1969. She specifically denied going to Hinman’s house in the latter part of July 1969, with Bruce Davis, Robert Beausoleil, or Susan Atkins. She admitted knowing in the latter part of July 1969, that Hinman was dead, but denied that she was in any way responsible for his death. She denied seeing Atkins hold a gun on Hinman. She denied seeing Beausoleil strike Hinman with a gun or seeing injuries to Hinman’s head. She denied bandaging Manson’s finger and denied seeing Atkins bandage Hinman’s head. When confronted with a transcript of her testimony in
 
 Beausoleil
 
 and given an opportunity to explain it, Brunner admitted testifying at the trial of Beausoleil, but testified in the case at bar that her testimony in the prior trial of Beausoleil was a lie, and that she lied in order to obtain immunity, to avoid a revocation of her probation, and to keep out of jail and retain possession of her child which had been fathered by Manson. She was given every opportunity to explain the reasons for the conflict between her testimony in the case at bar and her testimony in Beausoleil.
 
 [13]
 

 
 *31
 
 At the outset of the direct testimony of Brunner, the prosecutor undertook to examine her about a grant of immunity from the district attorney’s office but Manson’s lawyer and Manson personally objected. Because of his interference with the trial Manson then had to be removed from the courtroom and was held in an adjacent detention cell. Manson nevertheless continued to disrupt the proceedings by shouting through the open door of the detention cell and the court was compelled to close the door.
 
 [14]
 

 On his own motion, the trial judge undertook an in camera.investigation of the circumstances under which Brunner had been granted immunity in
 
 People
 
 v.
 
 Beausoleil, supra,
 
 and the terms of such grant of immunity, but counsel for Manson objected vigorously and repeatedly to any such inquiry by the court. The court appointed a lawyer (from the same law firm which previously represented Brunner) to advise Brunner regarding her rights. The lawyer did so and informed the court that Brunner had been fully advised of her rights. The court impliedly found that the prior testimony of Brunner in
 
 Beausoleil
 
 had been free and voluntary. (Evid. Code, § 402, subd. (c).)
 

 Prior inconsistent statements of a witness are admissible as substantive evidence if the requirements of Evidence Code section 770 are complied with. (Evid. Code, § 1235;
 
 California
 
 v.
 
 Green
 
 (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930];
 
 People
 
 v.
 
 Green
 
 (1971) 3 Cal.3d 981 [92 Cal.Rptr. 494, 479 P.2d 998];
 
 People
 
 v.
 
 Romo
 
 (1975) 14 Cal.3d 189, 194 [121 Cal.Rptr. 111, 534 P.2d 1015];
 
 People
 
 v.
 
 Collins
 
 (1975) 44 Cal.App.3d 617 [118 Cal.Rptr. 864];
 
 People
 
 v.
 
 Allen
 
 (1974) 41 Cal.App.3d
 
 *32
 
 196 [115 Cal.Rptr. 839];
 
 People
 
 v.
 
 Marcus
 
 (1974) 36 Cal.App.3d 676, 679 [111 Cal.Rptr. 772, 58 A.L.R.3d 594];
 
 People
 
 v. Jenkins (1973) 34 Cal.App.3d 893 [110 Cal.Rptr. 465];
 
 People
 
 v.
 
 Freeman
 
 (1971) 20 Cal.App.3d 488 [97 Cal.Rptr. 717].)
 

 Manson now contends that the prosecutor was guilty of suppressing evidence regarding the terms and extent of the grant of immunity given to Brunner. It is painfully evident that the failure,
 
 if any,
 
 of complete candor and disclosure regarding the grant of immunity was caused by the objections, filibustering and obstructionist tactics of Manson’s counsel and to a lesser degree by Manson personally. At trial Manson successfully objected to the prosecutor doing precisely what he now argues the prosecutor should have done.
 

 Manson also claims that the prosecution withheld from the jury evidence that Brunner was uncertain whether or not Manson was the father of her child. Brunner was asked a direct question and gave a direct answer that Manson was the father of her child. If she had doubts regarding paternity it was incumbent upon her to express them either on direct or cross-examination.
 
 [15]
 
 The prosecutor is not the witness.
 

 The prosecutor and Manson’s lawyer went over the transcript of Brunner’s testimony in the
 
 Beausoleil
 
 trial. Manson’s lawyer was allowed to offer any additional part of such testimony which he desired. Manson contends that none of the prior testimony of Brunner should have been received in evidence because the prosecution failed to offer portions of such prior testimony in connection with seven allegedly important facts. The claim is obviously an afterthought raised for the first time on appeal. No such claim was made in the trial court. As noted, Manson was allowed to offer any portion of such prior testimony which he desired.
 

 On direct examination in the case at bar, Brunner at her court-appointed lawyer’s urging, ultimately invoked the Fifth Amendment against 3 of the 72 questions propounded by the prosecutor. But, she nevertheless
 
 thereafter
 
 testified fully on cross-examination. She did not refuse to answer a single question on cross-examination. Manson’s counsel indicated he had no further questions and subsequent
 
 *33
 
 ly admitted that he had cross-examined as fully as desired. Brunner was not excused as a witness but remained available under court order for recall if desired. We note parenthetically that Manson called Brunner as his witness during the penalty phase of the trial after the jury had returned guilty verdicts on all three counts. At the time of her testimony during the penalty phase of the trial, Brunner had been charged with the murder of Hinman (allegedly because she had violated the terms of the grant of immunity; see
 
 People
 
 v.
 
 Brunner, supra)
 
 and she was also charged with perjury. At that time (during the penalty phase of the instant trial) Brunner did consistently invoke her Fifth Amendment rights. This fact does not alter our conclusion that she was fully examined during the trial in chief. In our view what happened at the penalty phase of the trial was nonprejudicial in view of the fact that the jury did not impose the death penalty.
 

 Manson’s lawyer objected to the offer of the testimony of Brunner as given in the
 
 Beausoleil
 
 case as a prior inconsistent statement on the additional ground that the requirements of Evidence Code sections 770 and 1235 had not been satisfied since Brunner was not “available” for cross-examination in view of the fact that she had invoked the Fifth Amendment. The court ruled that by testifying as fully as she did Brunner had waived the privilege against self-incrimination.
 
 (Rogers
 
 v.
 
 United States
 
 (1951) 340 U.S. 367 [95 L.Ed. 344, 71 S.Ct. 438];
 
 People
 
 v.
 
 Freshour
 
 (1880) 55 Cal. 375.)
 

 We conclude that Brunner was legally available for cross-examination; that in fact she was fully cross-examined by Manson during the guilt phase of the trial to the extent that he then desired; that the requirements of Evidence Code sections 770 and 1235 were fully satisfied; and that Brunner’s testimony was not inadmissible because she was not available for cross-examination. Such prior testimony was not inadmissible because it was given under a grant of immunity. The facts regarding such grant of immunity were fully disclosed to the jury in order that it could evaluate such testimony in the light of the fact that it was given under bias and prejudice, if any, generated by a grant of immunity.
 

 Manson also argues that the grant of immunity was unlawful because it was not approved by the court and that therefore Brunner’s prior testimony was inadmissible as a matter of law. The words of the court in
 
 People
 
 v.
 
 Brunner, supra,
 
 are apropos: “Yet while these factors bear heavily on the
 
 weight
 
 [italics in original] to be given the witness’ testimony, they do not impinge upon the validity of the bargain itself.” (P. 915.) The propriety of the grant of immunity has been judicially
 
 *34
 
 approved and upheld by a final judgment of this court.
 
 (People
 
 v.
 
 Brunner, supra.)
 

 Since we conclude that Brunner’s testimony was-properly admitted into evidence and that preliminary foundation requirements under Evidence Code section 770, were satisfied, the
 
 weight to
 
 be accorded such prior testimony as an inconsistent statement was a question for determination by the jury.
 

 b. Was Brunner an accomplice and if so, was her testimony sufficiently corroborated?
 

 Manson argues that the Brunner testimony in
 
 People
 
 v.
 
 Beausoleil, supra,
 
 should not have been admitted because Brunner was an accomplice as a matter of law and her testimony was not corroborated. The argument is devoid of merit for two reasons: (1) Brunner was not an accomplice as a matter of law, and (2) the testimony of Brunner (as given in the case of
 
 People
 
 v.
 
 Beausoleil, supra)
 
 was sufficiently corroborated.
 

 Brunner was not an accomplice as a matter of law because there was a conflict in her testimony as to whether or not she was even at Hinman’s house in July 1969. Brunner’s testimony (as given in
 
 Beausoleil)
 
 was corroborated by evidence of the physical facts surrounding the death of Hinman, by the testimony of Bailey (see
 
 infra,
 
 pp. 36-37), and others, by the fact that Beausoleil’s fingerprint was found in the Hinman residence, and by the several admissions of Manson personally. The corroboration was more than substantial.
 
 (People
 
 v.
 
 Smith
 
 (1970) 4 Cal.App.3d 41, 45 [84 Cal.Rptr. 229];
 
 People
 
 v.
 
 Henderson
 
 (1949) 34 Cal.2d 340, 343 [209 P.2d 785];
 
 People
 
 v.
 
 Scofield
 
 (1971) 17 Cal.App.3d 1018 [95 Cal.Rptr. 405];
 
 People
 
 v.
 
 Williams
 
 (1954) 128 Cal.App.2d 458, 462 [275 P.2d 513].)
 

 Manson argues that since Brunner was an accomplice as a matter of law the court should have instructed,
 
 sua sponte,
 
 that Brunner was an accomplice as a matter of law. As already indicated, the argument is based upon an improper assumption. If Brunner was an accomplice as a matter of law, the conclusion would be correct.
 
 (People
 
 v.
 
 Ferlin
 
 (1928) 203 Cal. 587 [265 P. 230];
 
 People
 
 v.
 
 Jones
 
 (1964) 228 Cal.App.2d 74, 94-95 [39 Cal.Rptr. 302].) However, the rule applies only where there is no conflict in the evidence that the person is in fact an accomplice.
 
 (People
 
 v.
 
 Coffey (1911) 161
 
 Cal. 433, 446 [119 P. 901];
 
 People
 
 v.
 
 Jones, supra.)
 

 
 *35
 
 The jury instructions which the court gave defined accomplice (CALJIC No. 3.10), advised the jury that the testimony of an accomplice must be corroborated (CALJIC No. 3.11), defined the sufficiency of the evidence which was required to corroborate the testimony of an accomplice (CALJIC No. 3.12), cautioned the jury that the testimony of an accomplice should be viewed with distrust (CALJIC No. 3.18), defined the criminal intent requisite to be an accomplice (CALJIC No. 3.14), and that one accomplice may not provide the requisite corroboration for another accomplice (CALJIC No. 3.13). Mánson’s argument that the court should also have instructed,
 
 sua sponte,.
 
 that Brunner was an accomplice as a matter of law, ignores the fact that there was a conflict in the evidence as to whether or not she was an accomplice at all. An instruction that Brunner was an accomplice as a matter of law would have clearly constituted prejudicial and reversible error, since such an instruction would have been tantamount to an instruction .that her testimony in the case at bar was untrue and that her testimony in
 
 People
 
 v.
 
 Beausoleil, supra,
 
 was true. Such an instruction would have usurped the jury’s function to determine which version of the facts was true. “ . . . Where the facts are in dispute as to the knowledge and intent of the asserted accomplice, the witnesses’ liability for prosecution is a question of fact for the jury.”
 
 (People
 
 v.
 
 Gordon
 
 (1973) 10 Cal.3d 460, 467 [110 Cal.Rptr. 906, 516 P.2d 298].)
 

 The court correctly instructed the jury on the law applicable to accomplices and the prosecution correctly argued to the jury that if Brunner told the truth in the case at bar, she was not an accomplice, but if she told the truth in her testimony in
 
 People
 
 v.
 
 Beausoleil, supra,
 
 she was an accomplice.
 
 (People
 
 v.
 
 Gordon, supra,
 
 pp. 472-473.)
 

 When Manson argues that Brunner was an accomplice as a matter of law, he inferentially admits that she was telling the truth in
 
 Beausoleil
 
 and lying in the case at bar. Such an admission might have been significant if it had been made at the trial level. It does not change the rule when made in this court.
 

 c. Was the prosecutor guilty of misconduct in arguing that Brunner’s testimony was corroborated?
 

 Manson argues that the prosecutor was guilty of misconduct and was permitted to mislead the jury by misstating the facts and the law in several respects. He argues that what the prosecution characterized as corroborating evidence of Brunner’s testimony (in
 
 People
 
 v.
 
 Beausoleil, supra)
 
 was not legally corroborative evidence. Manson devotes 10 pages
 
 *36
 
 of his opening brief on appeal to this argument. (Pp. 116-126.) Time and space do not permit a detailed analysis. In many respects the arguments are nonsensical. For example, Manson argues that evidence that Manson admitted slashing Hinman’s ear was not corroborative of the testimony of Brunner because Manson’s admissions did not specifically admit
 
 when
 
 he slashed Hinman’s ear.
 

 Manson argues in effect that evidence is not corroborative evidence unless each bit of evidence standing alone is sufficient to connect the defendant to the crime. Such is not the law. If the sum total of all of the evidence (other than the accomplice’s testimony), connects the defendant to the commission of the offense the requirements of Penal Code section 1111 are satisfied. Here the defendant’s admissions alone are sufficient to provide corroboration. Direct evidence is not required but circumstantial evidence will be sufficient.
 
 (People
 
 v.
 
 Mardian
 
 (1975) 47 Cal.App.3d 16, 43 [121 Cal.Rptr. 269].) The requirements of Penal Code section 1111 are satisfied if the sum total of all of the evidence connects the defendant to the crime and is sufficient to convince the juiy that the accomplice is telling the truth.
 
 (People
 
 v.
 
 Medina
 
 (1974) 41 Cal.App.3d 438, 466 [116 Cal.Rptr. 133].) Even slight circumstantial evidence may be sufficient.
 
 (People
 
 v.
 
 Thurman
 
 (1972) 28 Cal.App.3d 725 [104 Cal.Rptr. 804];
 
 People
 
 v.
 
 Manson, supra,
 
 61 Cal.App.3d 102.)
 

 Consequently the prosecutor had a right to argue each bit and piece of the evidence even though each bit and piece standing alone would not have been sufficient to supply the requisite corroboration. Just as an artist creates a mosaic a piece at a time, so a prosecutor creates a picture of guilt by consideration of individual bits of evidence, otherwise insignificant, which in totality convince the seeker of truth. The prosecutor was not guilty of misconduct merely because he characterized bits and pieces of evidence as corroboration when standing alone such bits and pieces would not have been sufficient to sustain a conviction. If the sum total was sufficient, the argument was proper. The sum total was sufficient.
 
 (People
 
 v.
 
 Hathcock
 
 (1973) 8 Cal.3d 599 [105 Cal.Rptr. 540, 504 P.2d 476];
 
 People
 
 v.
 
 Jenkins, supra,
 
 34 Cal.App.3d 893;
 
 People
 
 v.
 
 Randono
 
 (1973) 32 Cal.App.3d 164 [108 Cal.Rptr. 326];
 
 People
 
 v.
 
 McFarland
 
 (1971) 17 Cal.App.3d 807 [95 Cal.Rptr. 369].)
 

 6.
 
 Alleged Errors in Admission of Evidence Regarding Murder of Hinman
 

 
 *37
 
 a. The testimony of Bailey:
 

 Manson argues that the testimony of Bailey had three aspects: (1) of tending to prove robbery as a motive for the murder of Hinman, (2) of corroborating the testimony of Brunner, (3) of circumstantial evidence establishing Manson’s guilt independently of Brunner’s testimony and apart from motive. We agree.
 

 Manson assails the admission of Bailey’s testimony on several grounds. He contends that the prosecution violated the court’s discovery order, because although the prosecution produced for inspection a tape recording of a police interview with Bailey prior to trial, the tape recording was full of static and at least partially unintelligible. As a consequence Manson’s lawyer could not fully understand the tape recording. Subsequently a tape recording was produced which amplified the original tape. Manson now claims that he should have been given the amplified tape recording prior to trial although he made no such claim during trial. At trial he contended that the amplified tape “is not pertinent to these proceedings.”
 

 At trial Manson made a motion to strike the testimony of Bailey. The court conducted an evidentiary hearing regarding the tapes and the claim by one of Manson’s lawyers (Berlin) that when he heard the tape recording played, he heard Bailey make reference to “money and concessions.” Manson claims that the prosecution “bought” the testimony of Bailey. He also claims that the original tape recording was altered. As a result of the evidentiary hearing, it appeared that Officer Whiteley had given Bailey $20 for long distance telephone calls and prosecuting authorities in the State of Washington agreed to drop forgery charges against Bailey if she testified as a prosecution witness in the case at bar.
 

 The court concluded as a fact that the original tape recording was not altered, that Berlin and Kanarek were mistaken as to what they thought they heard on the tape, and that the discovery order had been fully complied with.
 
 [16]
 
 The court denied the motion to strike the testimony of Bailey.
 

 
 *38
 
 The prosecution did not suppress or conceal evidence within the principles enunciated in
 
 People
 
 v.
 
 Ruthford
 
 (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341] and
 
 People
 
 v.
 
 Westmoreland
 
 (1976) 58 Cal.App.3d 32, 44 [129 Cal.Rptr. 554]. Bailey testified fully that she understood that if she testified truthfully the forgery charges against her would be dropped. The only requirement was that Bailey testify truthfully. The agreement was lawful
 
 (People
 
 v.
 
 Manson, supra)
 
 and consequently Bailey’s testimony was properly received in evidence.
 

 Manson argues that Bailey’s testimony should not have been received in evidence because she was an accomplice as a matter of law. The argument is absurd. Bailey was not an accomplice to the murder of Hinman as a matter of law. She was a percipient witness to certain events which occurred prior to and after the robbery and death of Hinman, which constituted circumstantial evidence regarding the murder of Hinman. In addition after thé murder of Hinman, Bailey helped Brunner wipe down Hinman’s Volkswagen microbus after Brunner drove it to the Spahn Ranch. Both sides here seem to assume that the purpose of the “wipe down” was to remove fingerprints, but our reading of the record indicates that Manson successfully objected to Bailey’s testimony that that was the purpose of the “wipe down.”
 

 By virtue of his objection therefore Manson succeeded in preventing the prosecution from proving that Bailey was even an accessory after the fact. If Bailey had been permitted to testify, as the prosecution sought to establish, that she and Brunner had wiped fingerprints from Hinman’s Volkswagen microbus, she may well have been an accessory after the fact. (Pen. Code, §§ 30, 32;
 
 People
 
 v.
 
 Rutkowsky
 
 (1975) 53 Cal.App.3d 1069 [126 Cal.Rptr. 104];
 
 People
 
 v.
 
 Mitten
 
 (1974) 37 Cal.App.3d 879 [112 Cal.Rptr. 713];
 
 People
 
 v.
 
 Tewksbury
 
 (1976) 15 Cal.3d 953 [127 Cal.Rptr. 135, 544 P.2d 1335].) But she was not an accomplice (Pen. Code, § 31). The court, therefore, was not required to instruct that Bailey was an accomplice as a matter of law, and Bailey’s testimony was properly admitted without such an instruction.
 
 (People
 
 v.
 
 Randono, supra; People
 
 v.
 
 Tewksbury, supra.)
 

 
 *39
 
 b. The testimony of Arneson:
 

 Manson complains that the trial court erroneously admitted testimony by Arneson that he acquired the Hinman Volkswagen microbus from Manson at the end of July or early August 1969. The police interviewed Arneson on March 10, 1970, and made a tape recording of the interview. During the interview, Arneson could not remember precisely when he obtained the Volkswagen microbus from Manson but thought that he may have acquired it prior to his birthday which was June 24th. The interrogating officer pointed out that that date was impossible and that he must have gotten it at the end of July or early August and Arneson then said: “Yeah.” Typically Manson now accuses the officers of subornation of per jury.
 

 We do not so read the record. In our view, the officer who conducted the interview was merely attempting to clarify Arneson’s recollection which was obviously hazy, unclear and inaccurate. When the correct date was suggested, the witness recognized his error. But in any event, the issue was an issue of fact, the credibility of a witness, not an issue of law for an appellate court. All relevant evidence was presented to the trier of fact and the juiy impliedly concluded that Arneson obtained the automobile in the latter part of July or early August and that his original hazy recollection that it was prior to June 24 was inaccurate.
 

 The argument presents no issue of law for this court to resolve.
 

 c. The testimony of Springer:
 

 Manson contends that the prosecution suppressed evidence regarding the rap sheet relating to Springer and that if Springer’s rap sheet had been produced, the defense would have obtained evidence with which the defense could have discredited or impeached Springer. However, the record discloses that Manson was permitted to conduct an examination of Springer outside the presence of the jury regarding his prior criminal record. The trial court ruled that the discovery order had been complied with. The record here fails to establish that the prosecution suppressed any evidence within the meaning of
 
 People,
 
 v.
 
 Ruthford, supra,
 
 page 406.
 

 
 *40
 
 d. The introduction of Whiteley’s testimony:
 

 Manson argues that the court should have excluded testimony by Officer Whiteley regarding the conversation at counsel table in which Manson admitted that he slashed Hinman’s ear.
 

 Manson argues that during the evidentiary hearing regarding the circumstances under which Manson made his admissions to Whiteley, “It further developed that Whiteley took advantage of every opportunity when defense counsel was at the bench to engage Manson in conversation and that Manson was lured into these conversations by the hope that he could ‘program’ Whiteley, a desperate hope indeed.”
 

 This perversion of the record needs no reply except to refer to the record
 
 (ante,
 
 p. 16) in which the trial court found that the statements made by Manson were voluntary and not solicited by Whiteley. Where a defendant makes a voluntary admission to police which is unsolicited by the police, evidence of the admission is properly received in evidence.
 
 (Griffin
 
 v.
 
 Superior Court
 
 (1972) 26 Cal.App.3d 672, 696-697 [103 Cal.Rptr. 379].)
 

 e. The sufficiency of the evidence regarding Hinman’s murder:
 

 The evidence, direct and circumstantial, was uncontradicted that Hinman was murdered by someone. The totality of the evidence demonstrates that Hinman was murdered in the course of the robbery of Hinman by Beausoleil, Brunner, Atkins, Manson and Davis. While it is true that Brunner was a turncoat witness, unlike
 
 In re Eugene M.
 
 (1976) 55 Cal.App.3d 650 [127 Cal.Rptr. 851], here there was substantial evidence of Manson’s guilt beyond a reasonable doubt, other than the testimony of Brunner. Here five witnesses (Whiteley, Blackburn, Springer, Hoyt and Bailey) testified to four admissions of guilt by Manson, at different times and places in the presence of different witnesses, any one of which would have been sufficient to connect Manson to the murder. Other evidence, such as. Manson’s possession and sale of property acquired as the result of the robbery and murder of Hinman, demonstrates an overwhelming basis beyond a reasonable doubt for the jury’s verdict of guilt. We conclude that there was substantial evidence to sustain the jury’s verdict that Manson was guilty of the murder of Hinman within the scope of Penal Code section 189.
 

 7.
 
 The Murder of Shea
 

 
 *41
 
 a. Sufficiency of evidence to establish corpus delicti:
 

 Manson argues that the evidence was insufficient to establish the corpus delicti that Shea was murdered.
 

 “The corpus delicti is established when it is proved that a crime has been committed by someone.”
 
 (People
 
 v.
 
 White
 
 (1960) 186 Cal.App.2d 853, 857 [9 Cal.Rptr. 99], citing
 
 People
 
 v.
 
 Cobb,
 
 45 Cal.2d 158 [287 P.2d 752];
 
 People
 
 v.
 
 McMonigle,
 
 29 Cal.2d 730 [177 P.2d 745];
 
 People
 
 v.
 
 Selby,
 
 198 Cal. 426 [245 P. 426].) “The corpus delicti consists of two elements, namely (1) the injury or loss or harm; and (2) a criminal agency causing them to exist.”
 
 (People
 
 v.
 
 Wong
 
 (1973) 35 Cal.App.3d 812, 839 [111 Cal.Rptr. 314], citing
 
 People
 
 v.
 
 Frey,
 
 165 Cal. 140, 146 [131 P. 127];
 
 Iiams
 
 v.
 
 Superior Court,
 
 236 Cal.App.2d 80, 82 [45 Cal.Rptr. 627].) “In homicide, the corpus delicti may consist of the death of the alleged victim and the existence of some criminal agency as the cause.”
 
 (People
 
 v.
 
 Beach
 
 (1963) 212 Cal.App.2d 486, 492 [28 Cal.Rptr. 62].)
 

 “The preliminary proof of the corpus delicti need not be ‘beyond a reasonable doubt’ but only a slight or prima facie showing is necessary.”
 
 (People
 
 v.
 
 Wong, supra,
 
 p. 839, citing
 
 People
 
 v.
 
 Mehaffey,
 
 32 Cal.2d 535, 545 (197 P.2d 12) [cert, den., 335 U.S. 900 [93 L.Ed. 435, 69 S.Ct. 399]];
 
 Ureta
 
 v.
 
 Superior Court,
 
 199 Cal.App.2d 672, 675 [18 Cal.Rptr. 873]; see
 
 People
 
 v.
 
 Huber,
 
 225 Cal.App.2d 536, 542 [37 Cal.Rptr. 512].) In California any element of the corpus delicti may be established by circumstantial evidence. In fact, the corpus delicti may be established in its entirety by circumstantial evidence.
 
 (People
 
 v.
 
 Westfall
 
 (1961) 198 Cal.App.2d 598, 601-602 [18 Cal.Rptr. 356];
 
 People
 
 v.
 
 Huber, supra,
 
 225 Cal.App.2d 536, 542, citing
 
 People
 
 v.
 
 Scott, supra,
 
 176 Cal.App.2d 458;
 
 People
 
 v.
 
 Amaya,
 
 40 Cal.2d 70, 75 [251 P.2d 324]; see
 
 People
 
 v.
 
 Wong, supra,
 
 p. 839.)
 

 The identity of the perpetrator of the crime is never an essential element of the corpus delicti. “ ‘Proof of the corpus delicti does not require proof of the identity of the perpetrators of the crime, nor proof that the crime was committed by the defendant.’ ”
 
 (People
 
 v.
 
 Huber, supra,
 
 p. 542, citing
 
 People
 
 v.
 
 Cobb,
 
 45 Cal.2d 158, 161 [287 P.2d 125]; see
 
 People
 
 v.
 
 White, supra.)
 
 “[N]o part of it [the corpus delicti] can be proved by the extrajudicial admissions or confessions of the defendant, and unless the corpus delicti is established such statements cannot be admitted in evidence.”
 
 (People
 
 v.
 
 Wong, supra,
 
 p. 839, citing
 
 People
 
 v.
 
 Quarez,
 
 196 Cal. 404, 409 [238 P. 363];
 
 People
 
 v.
 
 Lopez,
 
 254 Cal.App.2d
 
 *42
 
 185,
 
 189-190 [62
 
 Cal.Rptr.
 
 47]; People
 
 v.
 
 Parker, 122
 
 Cal.App.2d 867, 872 [265 P.2d 933].) This principle is considered to be sufficient protection to guard against a defendant confessing to a crime which was never committed.
 

 However, once a prima facie showing of the corpus delicti has been presented, even by circumstantial evidence, then admissions and confessions of the defendant are admissible in evidence and may be considered along with other evidence. When the admissions become admissible they may be sufficient to raise the quantity of proof to proof beyond a reasonable doubt.
 
 (People
 
 v.
 
 Beach, supra,
 
 212 Cal.App.2d 486, 492.)
 

 Numerous cases quote the following language from
 
 People
 
 v.
 
 Selby, supra,
 
 198 Cal. 426, 437: “It is apparent from this review of the cases that the general trend of authority has been to hold that upon
 
 prima facie
 
 proof of the
 
 corpus delicti
 
 the extrajudicial statements, admissions, or confessions of the accused may be
 
 admitted
 
 in evidence and having been so properly admitted they may, with the evidence aliunde, be considered by the jury in its determination whether or not all the elements of the crime and the connection therewith of the accused have been established to a moral certainty and beyond all reasonable doubt.” (See also
 
 People
 
 v.
 
 Hudson
 
 (1934) 139 Cal.App. 543, 544 [34 P.2d 741], quoted in
 
 People
 
 v.
 
 Huber, supra,
 
 225 Cal.App.2d 536;
 
 People
 
 v.
 
 Westfall, supra,
 
 198 Cal.App.2d 598, 602; italics in original.)
 

 The defendant’s admissions or confessions are competent evidence after prima facie proof of- the corpus delicti is made and may of themselves be sufficient to establish his connection with the crime.
 
 (People
 
 v.
 
 Watson
 
 (1961) 198 Cal.App.2d 707, 712 [18 Cal.Rptr. 234].)
 

 Here Manson places great emphasis on the fact that Shea’s body was never recovered. The fact that Shea’s body was never recovered would justify an inference by the jury that death was caused by a criminal agency. It is highly unlikely that a person who dies from natural causes will successfully dispose of his own body. Although such a result may be a theoretical possibility, it is contrary to the normal course of human affairs.
 

 The fact that a murderer may successfully dispose of the body of the victim does not entitle him to an acquittal. That is one form of success for which society has no reward. Production of the body is not a condition precedent to the prosecution for murder.
 
 (People
 
 v.
 
 Cullen
 
 (1951) 37 Cal.2d 614, 624 [234 P.2d 1];
 
 People
 
 v.
 
 Scott, supra.)
 
 In
 
 People
 
 
 *43
 
 v.
 
 Cullen, supra,
 
 the court said (pp. 624, 625): “Here the corpus delicti consists of two elements, the death of the alleged victims and the existence of some criminal agency as the cause, either or both of which may be proved circumstantially or inferentially. [Citations.] [¶ It is not necessary in order to support the conviction that the bodies actually be found. ... [¶ Proof of the corpus delicti does not require identity of the perpetrators. It is not necessaiy that it connect the defendant with the commission of the crime although it may do so. [Citations.] Nor does motive form any part of the corpus delicti. [Citations.] [¶ It is the settled rule, however, that the corpus delicti must be established independently of admissions of the defendant. Conviction cannot be had on his extrajudicial admissions or confessions without proof
 
 aliunde
 
 of the corpus delicti; but full proof of the body of the crime, sufficient to convince the jury of its conclusive character, is not necessary before the admissions may be received. A prima facie showing that the alleged victims met death by a criminal agency is all that is required. The defendant’s extrajudicial statements are then admissible, the order of proof being discretionary, and together with the prima facie showing must satisfy the jury beyond a reasonable doubt. [Citations.] The purpose of the rule is to protect the defendant against the possibility of fabricated testimony which might wrongfully establish the crime and the perpetrator. [Citations.]” (Italics in original.)
 

 Here the prosecution’s evidence established that Shea was dead and that he met death by criminal means; it established that Manson, and his family, had a significant motive to murder Shea. Manson’s own admissible admissions established guilt beyond a reasonable doubt. The evidence was clearly sufficient.
 

 b. The “Screaming lineup”
 

 Manson claims that the trial court committed reversible error because it denied his request to conduct a “screaming lineup” in the presence of the jury at the Spahn Ranch to determine whether or not Hoyt was truthfull when she testified that she heard Shea screaming late at night in the latter part of August 1969. Manson wanted to use a “group” of people in the test. For obvious reasons Shea would not have been one of the group.
 

 In effect, Manson wanted to conduct an experiment. The trial court’s discretion to refuse an experiment is very broad.
 
 (People
 
 v.
 
 Skinner
 
 (1954) 123 Cal.App.2d 741, 751 [267 P.2d 875];
 
 People
 
 v.
 
 King
 
 (1951) 104 Cal.App.2d 298, 307 [231 P.2d 156];
 
 People
 
 v.
 
 Sherman
 
 (1950) 97
 
 *44
 
 Cal.App.2d 245, 253 [217 P.2d 715];
 
 Schauf
 
 v.
 
 Southern Cal. Edison Co.
 
 (1966) 243 Cal.App.2d 450, 455 [52 Cal.Rptr. 518].) Experiment evidence may be rejected if it consumes an undue amount of time.
 
 (Culpepper
 
 v.
 
 Volkswagen of America, Inc.
 
 (1973) 33 Cal.App.3d 510, 521 [109 Cal.Rptr. 110].) Before such experiments are permitted, it must be established that the conditions will be substantially similar.
 
 (Chambers
 
 v.
 
 Silver
 
 (1951) 103 Cal.App.2d 633 [230 P.2d 146];
 
 Yecny
 
 v.
 
 Eclipse Fuel Engineering Co.
 
 (1962) 210 Cal.App.2d 192, 203-205 [26 Cal.Rptr. 402];
 
 Culpepper
 
 v.
 
 Volkswagen of America, Inc., supra; People
 
 v.
 
 Terry
 
 (1974) 38 Cal.App.3d 432, 445 [113 Cal.Rptr. 233].)
 

 In
 
 People
 
 v.
 
 Spencer
 
 (1922) 58 Cal.App. 197 [280 P. 380], the prosecution was permitted to produce evidence of an experiment that it would have been possible for a witness at one designated point to hear a woman screaming at another designated point. In
 
 Spencer, supra,
 
 the prosecution did not seek to identify the screaming of a particular individual but just the fact of screaming generally. However, that was not the purpose of Manson’s motion in the case at bar. His motion was to conduct a screaming lineup to establish that the witness would not have been able to identify the screams of a particular designated person (Shea) who would not have been in the lineup.
 

 The fact, if it be a fact, that the witness might or might not have been able to identify the screams of one or even several persons would have no probative value as to whether or not she would have been able to identify the voice of Shea had he been in the lineup, or more importantly whether she identified the voice of Shea on the particular night in question. The identifying characteristics of individual human voices are very disparate. The ability to identify the voice of a particular individual depends upon the characteristics of that individual’s voice and the familiarity of the witness with that individual’s voice. Identification or failure to identify one human voice does not necessarily prove or disprove the ability to identify another human voice. Furthermore, experiment evidence must be conducted under substantially similar circumstances. Here Hoyt heard Shea scream late at night. It is a matter of common knowledge that background noises are usually at a minimum and that sounds usually carry better and are more distinct late at night. “The still of the night” is more than a poetic phrase. Atmospheric conditions may well be different at different times of the day. To grant Manson’s request, therefore, the jury would have been required to go to the Spahn Ranch late at night in order to have the experiment conducted under substantially similar conditions. Furthermore, since the precise place of murder was unknown to the prosecution and court, the court
 
 *45
 
 would have been unable to determine whether or not the persons who would be doing the “screaming” would be at the point where Shea was when he screamed and was heard by Hoyt. The trial court, in the exercise of its sound discretion, may refuse such experiment under dissimilar circumstances and where the trial would have been unduly disrupted.
 

 If so-called scientific voice print experiments are not admissible in evidence
 
 (People
 
 v.
 
 King
 
 (1968) 266 Cal.App.2d 437 [72 Cal.Rptr. 478];
 
 People
 
 v.
 
 Law
 
 (1974) 40 Cal.App.3d 69 [114 Cal.Rptr. 708];
 
 People
 
 v.
 
 Kelly
 
 (1976) 17 Cal.3d 24, 35 [130 Cal.Rptr. 144, 549 P.2d 1240]), it is clear that the court did not abuse its discretion in the case at bar by refusing the request for a “screaming lineup.” Certainly no abuse of discretion is shown here.
 

 c. The testimony of Magdalene Shea:
 

 Manson claims that his cross-examination of Magdalene Shea (wife of Shea) was unduly restricted and that he was not permitted to establish that Shea was afraid of the boy friends of Magdalene Shea and that he might have left town because of such fear.
 

 The court ruled that the defense would be permitted to establish “. .. that there was a threat made to Shorty Shea by someone in her [Magdalene’s] presence,” that if there was a threat made to kill Shea “. .. that it might establish some motive for Mr. Shea leaving town, disappearing” that since the prosecution was trying to prove that the disappearance of Shea was due to his demise “The defense has a right to show that he might have had the possible state of mind that he was fearful of someone, and left as a result of that.” Thereafter, Manson was permitted to cross-examine Magdalene Shea extensively and he never asked a single question about threats made to or in the presence of Shea or any other event which would have provided motivation for Shea to leave town. We conclude that the claim that cross-examination of Magdalene Shea was unduly restricted is a distortion of the record.
 

 Manson called Miriam Binder as a defense witness and attempted to establish a conversation between Binder and Shea in which Binder quoted Shea’s wife, Magdalene, as saying that she [Magdalene] was leaving Shea because of Magdalene Shea’s fear of what her boy friends might do to Shea. The court sustained an objection on the ground that such statement did not show Shea’s state of mind but only showed Magdalene’s state of mind. The court characterized it as second
 
 *46
 
 party—third party hearsay. We find no error in the ruling. Magdalene Shea’s state of mind was not in issue. Magdalene Shea’s state of mind would have no probative value on the issue of whether or not Shea’s state of mind was such that Shea might have fled and gone into hiding.
 

 d. Cross-examination of Officer Whiteley:
 

 Manson contends that the trial court committed error in receiving evidence from Officer Whiteley of efforts made by him to determine the existence or whereabouts of Shea. Since the body of Shea was not recovered, it was incumbent upon the prosecution to prove that Shea was not alive which, of course, had to be done by negative evidence. Whiteley testified to contacts which he made with jails, hospitals, governmental agencies, utilities, credit organizations, prospective employers and similar agencies, relatives, and persons throughout all of the states of the United States with which Shea had any previous contact. The evidence was clearly relevant, competent and admissible to prove by negative inference that Shea was not alive which was a necessary element of proof of the crime of murder when the body was not recovered.
 
 (People
 
 v.
 
 Scott, supra.)
 

 Manson also claims that the court unduly restricted his cross-examination of Whiteley regarding Whiteley’s contacts with Miriam Binder regarding declarations made by Shea to Binder regarding statements made by Magdalene Shea to Shea regarding threats made to her by her boy friends. (See
 
 ante,
 
 p. 45.) In our view of the record the cross-examination of Whiteley was not unduly restricted because it is manifest from the testimony of Binder that evidence from Binder (if discovered by Whiteley’s investigation) would have related only to Magdalene Shea’s state of mind and not Shea’s state of mind.
 

 We find no prejudice in any event since Binder testified personally as a defense witness and she was fully examined to the extent that her testimony was relevant and competent.
 

 8.
 
 Demurrer to count II of the Indictment
 

 Manson contends that his section 995 motion to dismiss the indictment and his demurrer to count II of the indictment for uncertainty should have been granted and sustained.
 

 
 *47
 
 Manson contends that count II of the indictment was ambiguous because it did not allege the specific identity of the person the conspirators intended to rob and murder. The gravamen of the offense of conspiracy to commit a crime is the unlawful agreement of two or more people and the overt act or acts in furtherance thereof, not that the substantive crime is actually committed.
 
 (People
 
 v.
 
 Manson, supra,
 
 p. 156; 1 Witkin, Cal. Crimes, Elements of Crime, § 105, p. 99.) Under Manson’s argument if two or more persons conspire to go out on the street and rob and murder the first person they meet (and they committed an overt act in furtherance of the conspiracy) no offense would have been committed since the conspirators did not know in advance the identity of the person who would be the first person they would meet on the street. No case is cited which holds that conspirators must know in advance the identity of their victim or that the indictment must allege the identity of the victim of the conspiracy.
 

 Under Penal Code section 182, subdivision l,
 
 [17]
 
 it is sufficient to state the offense of conspiracy if the object of the conspiracy is “To commit any crime.” (1 Witkin, Cal. Crimes, §§ 114, 117, pp. 108, 110; Witkin, Cal. Criminal Procedure, § 192.) Count II of the indictment properly charged the offense of conspiracy to commit robbery and murder even though the victim was unnamed. (Pen. Code, § 952.)
 

 One of the reasons for the requirement of specificity in the indictment or information is to advise the defendant of the charge against which he must defend.
 
 (People
 
 v.
 
 Marshall
 
 (1957) 48 Cal.2d 394, 399, fn. 5 [309 P.2d 456];
 
 People
 
 v.
 
 Beesly
 
 (1931) 119 Cal.App. 82, 85-86 [6 P.2d 114, 970].) Here count II of the indictment set forth a specific street address at which the unlawful object of the conspiracy —robbery and murder—was to be accomplished. “Notice of the particular circumstances of the offense is given not by detailed pleading but by the transcript of the evidence before the committing magistrate (or the grand jury); ...”
 
 (People
 
 v.
 
 Roberts
 
 (1953) 40 Cal.2d 483, 486 [254 P.2d 501].) Manson was therefore adequately informed of the details of the charge against which he was required to defend even though the specific victim was not named in the indictment. “No accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon
 
 *48
 
 the merits.” (Pen. Code § 960;
 
 People
 
 v.
 
 Powell
 
 (1974) 40 Cal.App.3d 107, 123 [115 Cal.Rptr. 109];
 
 People
 
 v.
 
 Koch
 
 (1970) 4 Cal.App.3d 270, 276 [84 Cal.Rptr. 629].) There is nothing in this record to suggest that Manson was misled or prejudiced in any way. By virtue of the allegations of count I of the indictment, Manson was fully advised that he was accused of the murder of Hinman.
 

 9.
 
 Selection of the Petit Jury
 

 Manson claims that a large number of prospective trial jurors were excused because of financial hardship and thus the jury was composed primarily of upper-middle-class persons who have their salaries paid while on jury duty. He claims that consequently he was “deprived of the services of persons whose outlook toward the Manson ogre myth might have been entirely different than that of the jurors actually chosen.”
 

 The purpose of the jury is to guard against the exercise of arbitrary power. The requirement that a jury represent a fair cross-section of the community is a fundamental part of the Sixth Amendment guarantee to a jury trial
 
 (Taylor
 
 v.
 
 Louisiana
 
 (1974) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692]), which is made binding on the states by virtue of the Fourteenth Amendment.
 
 (Duncan
 
 v.
 
 Louisiana
 
 (1968) 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444].)
 

 Manson’s argument misconceives the function of the jury in our judicial system. A jury does not exist to serve either party, but to serve society and the cause of justice. It should not be partisan to
 
 either
 
 side. The argument is essentially that Manson was entitled to be tried by a jury which was prejudiced in his favor. There is no principle of law, constitutional or otherwise, of which we are aware, which supports this position.
 
 Defendants are not entitled to a jury of any particular composition
 
 nor is there a requirement that petit juries actually chosen be representative of the various distinct, economic, political, social or racial groups in the community.
 
 (Thiel
 
 v.
 
 Southern Pacific Co.
 
 (1946) 328 U.S. 217, 220 [90 L.Ed. 1181, 1184, 66 S.Ct. 984, 166 A.L.R. 1412];
 
 Taylor
 
 v.
 
 Louisiana, supra,
 
 p. 538 [42 L.Ed.2d, p. 702].) Likewise, a defendant of one economic status is not entitled to be tried by only jurors of the same economic status.
 

 The constitutional requirement is that the jury he drawn from a pool as broadly representative of the community as possible.
 
 There can be no systematic and intentional exclusion of any group by court officials.
 
 (Thiel
 
 v.
 
 Southern Pacific Co., supra,
 
 p. 220.) The defendant has the
 
 *49
 
 burden of establishing intentional discrimination or systematic exclusion of a certain social group or economic class from the jury.
 
 (People
 
 v.
 
 Gibbs
 
 (1970) 12 Cal.App.3d 526, 539 [90 Cal.Rptr. 866].) Manson makes no showing that either an economic class is underrepresented in the jury pool, or that such underrepresentation is due to purposeful state action.
 

 The procedure of compiling jury venires in Los Angeles County by random withdrawal of names from voter registration lists was carefully examined and held to be constitutionally valid in
 
 People
 
 v.
 
 Powell, supra,
 
 40 Cal.App.3d 107, 126, citing, inter alia,
 
 People
 
 v.
 
 Sirhan, supra,
 
 7 Cal.3d 710, 749-750.
 
 Powell
 
 rejected a contention that this random process resulted in the exclusion of lower socio-economic elements from jury service while
 
 People
 
 v.
 
 Murphy
 
 (1973) 35 Cal.App.3d 905 [111 Cal.Rptr. 295], found no merit in the claim that a similar selection process in Orange County resulted in the systematic exclusion of businessmen or wage earners.
 

 “Jury service is a duty as well as a privilege of citizenship;. . .”
 
 (Thiel, supra,
 
 p. 224 [90 L.Ed., p. 1187].) A state may grant exemptions from jury service to individuals in case of special hardship or incapacity and such exemptions do not impose a threat that the remaining pool of jurors would not be representative of the community.
 
 (Taylor, supra,
 
 p. 534 [42 L.Ed.2d, p. 700].) Persons whose income levels reach both ends of the spectrum work for private companies or governmental agencies that pay their employees while on jury duty. This practice, rather than being condemned, should be applauded as a means of eliminating, often at private expense, what could be a substantial financial burden upon many, particularly the poor, and thus enable thousands of people to perform their civic duty.
 

 A substantially similar attack on the petit jury was made and denied in the Tate-LaBianca cases.
 
 (People
 
 v.
 
 Manson, supra,
 
 p. 166.) There is no factual or legal basis for a different ruling here.
 

 10.
 
 Manson’s Right to Act as His Own Lawyer
 

 Manson contends that the judgment must be reversed because the trial court erroneously denied his numerous requests to act as his own lawyer. He relies on
 
 Faretta
 
 v.
 
 California, supra.
 
 Prior to
 
 Faretta,
 
 California did not recognize the principle that a defendant had the
 
 *50
 
 constitutional right to act as his own counsel.
 
 (People
 
 v.
 
 Sharp
 
 (1972) 7 Cal.3d 448, 461 [103 Cal.Rptr. 233, 499 P.2d 489];
 
 People
 
 v.
 
 Floyd
 
 (1970) 1. Cal.3d 694 [83 Cal.Rptr. 608, 464 P.2d 64].)
 

 The argument is devoid of merit for four reasons: (1)
 
 Faretta
 
 is not retroactive
 
 (People
 
 v.
 
 McDaniel
 
 (1976) 16 Cal.3d 156, 168 [127 Cal.Rptr. 467, 545 P.2d 843];
 
 People
 
 v.
 
 Manson, supra,
 
 p. 172 [a point which Manson concedes]). (2)
 
 Faretta
 
 recognizes an exception to the general rule that a defendant has a constitutional right to act as his own lawyer—the exception is that the court may deny the right where it is abused by disruptive
 
 conduct—(Faretta
 
 v.
 
 California, supra,
 
 pp. 834-835, fn. 46 [45 L.Ed.2d, pp. 580-581]). In the case at bar (as in the Tate-LaBianca cases), the court was frequently (on almost a daily basis) compelled to remove Manson physically from the courtroom because of his disruptive conduct. In fact he frequently continued to disrupt the trial
 
 after
 
 he was removed from the courtroom and while he was held in an adjacent detention area.
 
 [18]
 
 The case at bar, therefore, comes within the exception rather than the general rule. (3)
 
 Faretta
 
 declares that before a defendant may serve as his own lawyer, the court must find that he has made a knowing and intelligent waiver of his right to counsel. In the case at bar, after an extensive examination, the trial court found that Manson did not have the capacity to make a knowing and intelligent waiver of his right to be represented by counsel. The court found that Manson did not have the “capacity to make an intelligent waiver” of the right to counsel “or any real conception ... of the consequences of a waiver.” The court said: “You don’t have the capacity to waive counsel.” (4) If Manson had been permitted to represent himself from the outset this appeal would not even be in this court because Manson attempted to plead guilty in the court below.
 
 [19]
 
 In addition on July 14, 1971, while this case was on trial, Manson also stated (in the absence of the jury) “I enter a plea of guilty. I chopped his head off.” The trial court refused to allow Manson to enter a plea of guilty solely because his attorney
 
 of record
 
 would not join therein. It is clear therefore that if Manson had been permitted to act as his own attorney from the outset, he would have entered a plea of guilty, and this appeal would not now be before this court. Consequently, the denial of his right to act as his own attorney was not prejudicial to Manson although it was clearly prejudicial to the People.
 

 
 *51
 
 We have carefully reviewed all of Manson’s arguments and claims of error whether or not discussed herein in detail, and we conclude that there was no prejudicial error which requires reversal of the judgment.
 

 The judgment is affirmed.
 

 Wood, P. J„ and Hanson, J.,'concurred.
 

 A petition for a rehearing was denied July 19, 1977, and appellant’s petition for a hearing by the Supreme Court was denied September 21, 1977.
 

 *
 

 Assigned by the Chairperson of the Judicial Council.
 

 [1]
 

 Manson has requested us to take judicial notice of the records in all companion cases and in all related cases involving the so-called Tate-LaBianca murders which occurred on August 9 and 10, 1969.
 
 (People
 
 v.
 
 Manson
 
 (1976) 61 Cal.App.3d 102 [132 Cal.Rptr. 265], cert. den. April 25, 1977; 430 U.S. 986 [52 L.Ed.2d 382, 97 S.Ct. 1686].) Davis was tried separately for the murder of Hinman and judgment of conviction was affirmed in
 
 People
 
 v.
 
 Davis,
 
 2d Crim. 22505 on March 31, 1976 (unpublished opinion). Grogan was tried separately for the murder of Shea and judgment of conviction was affirmed.
 
 (People
 
 v.
 
 Grogan,
 
 2d Crim. 21932 on January 19, 1973 [unpublished opinion].) Kenneth Beausoleil (Beausoleil) was separately indicted and separately tried for the murder of Hinman and judgment of conviction was affirmed.
 
 (People
 
 v.
 
 Beausoleil,
 
 2d Crim. 22232 [unpublished opinion].) Atkins entered a plea of guilty and was given life imprisonment.
 

 [2]
 

 The reporter’s transcript consists of 11,1 ¡8 pages. Fifty-one witnesses were called by the People, 23 witnesses were called by Manson; 98 exhibits were offered by the People; 54 exhibits were offered by Manson. Many additional special' exhibits were offered by both sides.
 

 [3]
 

 In view of the voluminous record we summarize only that evidence which is most relevant to a consideration and understanding of the issues on appeal. We do not summarize the evidence in the sequence presented in the trial court. In accordance with well established rules on appeal, we summarize the evidence in the light most favorable to respondent.
 
 (People
 
 v.
 
 Reilly
 
 (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649];
 
 People
 
 v.
 
 McDowell
 
 (1976) 59 Cal.App.3d 807, 810 [130 Cal.Rptr. 839];
 
 People
 
 v.
 
 Alfaro
 
 (1976) 61 Cal.App.3d 414, 418 [132 Cal.Rptr. 356].)
 

 [4]
 

 For a description of the Spahn Ranch and activities of the Manson family there see
 
 People
 
 v.
 
 Manson, supra,
 
 61 Cal.App.3d 102, 127-130.
 

 [5]
 

 The trial court sustained Manson’s objections to the prosecution’s efforts to prove by Brunner that while at the ranch Beausoleil had telephoned Manson for help.
 

 [6]
 

 Whiteley was one of the officers in charge of the investigation and assisted the prosecutor throughout the trial.
 

 [7]
 

 Manson testified in part as follows:
 

 “Q. By MR. KANAREK: Let’s say last Tuesday.
 

 Do you have any recollection, Mr. Manson, of any conversation last Tuesday?
 

 “A. To recall the conversation verbatim would be impossible.
 

 “Uh, the conversation went something into the likeness of what the sergeant [Whiteley] had said on the stand.
 

 “We were talking, uh, about my being at the Hinman house. I was programming him for something. I forgot what it was at the time. But we were talking about the Hinman house. And I told him that I had to go over there because my brother couldn’t stand up. He was stuck in his mother’s mind. And I says that I took the gun away from the guy and I had to cut him. And I felt bad about it. And that I had asked the girls to stay there and clean the place up and clean Mr. Hinman up. That this was two days before Mr. Hinman was supposedly murdered. And that I couldn’t see why I was being held responsible for something someone else did.
 

 “That very same day we were talking about the social consciousness. We were talking about casting spells upon the social consciousness. We were talking about fires. We were talking about the revolution, in general police talk, procedure talk.
 

 “The newspaperman—I seen him leaning over with his big ear. He’s had it there ever since we came to the trial. And I could see why he would call it a confession because he some headlines from it. It was no more than what I said here.
 

 “I did mention to Mr. Whiteley another day about how many people could be held responsible for one murder, for one crime.
 

 “In general, Mr. Whiteley’s statements were right, except for the last two or three words he said on the last statement about what I said and the day—on the date in question. And if I can recall—oh, that—that I left Bobby to do something. Bobby does what Bobby does. I don’t direct Bobby in any direction. I said that I had to show Bobby with a motion how to stand up and be his own father, and that Gary Hinman being dead was no loss to the world, because he dealt bad dope anyway.
 

 “And then, I also said that ‘Wouldn’t it be funny if you got a telephone call from Shorty Shea?’ And we both laughed.
 

 “And then, I said, ‘It doesn’t—it seems doubtful that that will happen.’
 

 “As strange as the words seem, like holes in sound, you people change them to suit yourselves.”
 

 [8]
 

 Brunner had been granted immunity for her testimony in
 
 People
 
 v.
 
 Beausoleil.
 
 (See
 
 People
 
 v.
 
 Brunner
 
 (1973) 32 Cal.App.3d 908 [108 Cal.Rptr. 501 ].)
 

 [9]
 

 This last portion was stricken as a result of a barrage of motions and objections by Manson’s lawyer. Our examination of the record discloses that an estimated 20 percent of the record during the People’s case consists of defense objections and motions, most of which were inappropriate, unnecessary and ill advised. For example, when the People offered evidence of declarations by Shea evidencing Shea’s state of mind for the purpose of proving that Shea was dead, Manson objected on the ground that it violated-his Sixth and Fourteenth Amendments right to confront the dead declarant. In at least one instance, Manson’s counsel refused an offer from the court of a continuous running motion for mistrial. We are convinced that the orderly presentation of the prosecution was obstructed by the sheer mass of objections and motions by Manson’s lawyer, most of which were devoid of merit, but which had the effect of obscuring vital evidence. The trial court erroneously sustained some of the objections and erroneously granted some of the motions. The sheer mass of motions and objections obviously interfered with the thought processes of the prosecutor and witnesses which is apparently what they were
 
 *20
 
 intended to do. This case can most accurately be characterized as trial by filibuster.
 

 Apparently the defense technique was to attempt to submerge the material in a sea of immateriality in the hope that the jury would lose sight of the salient points of the People’s case. If so, the technique was not successful.
 

 [10]
 

 Manson’s statements of issues in his opening brief encompasses more than four pages. Time and space require that they be restated here in abbreviated form.
 

 [11]
 

 Inconsistently he then admits that the prosecutor’s evidence “appears overwhelming in favor of guilt.”
 

 [12]
 

 At the conclusion of the examination of the jurors the court made the following statement which we interpret as the equivalent of findings:
 

 “THE COURT: The Court has listened to these jurors and watched them as they have responded to the Court’s questions and to counsel’s questions. And I am convinced that except in one case that the exposure to any publicity was unintentional on the part of the jurors and I’m convinced, except in one case, that there’s no likelihood that what the have been to will affect their in the case.
 

 “The court is convinced that the jury remains fair and impartial and that the jury will base its judgments called for in the case solely upon the evidence and the Court’s instructions of law.
 

 “However, the Court invites any comment from either counsel as to the situation in the state of mind of Mrs. Luster. She has had a shooting occur in her neighborhood, apparently in front of her house, and the person as a result of that shooting has apparently died in her living room. And she did appear to the Court to be quite emotionally upset when she was responding to the Court’s questions this morning.”
 

 [13]
 

 We note that in the opinion in
 
 People
 
 v.
 
 Brunner, supra,
 
 32 Cal.App.3d 908, the court there recites that in May 1970, in connection with a motion for a new trial in
 
 People
 
 v.
 
 Beausoleil, supra,
 
 an affidavit was filed executed by Brunner in which she asserted that her testimony in that case had been untrue but “She then recanted and said her testimony before the grand jury and at the trial was true'. . . .” (P. 911.)
 

 [14]
 

 The transcript discloses the following:
 

 “Q. On Sunday, July 27th of 1969, were you present at the Hinman home when a call was made from the Hinman home to the Spahn Ranch?
 

 “MR. KANAREK: Your Honor, that assumes facts not in evidence.
 

 “THE COURT: The objection is overruled.
 

 “Q. By MR. MANZELLA: You may answer the question.
 

 “A. These questions are all repetitious. They don’t mean anything.
 

 “DEFENDANT MANSON: (Through the door of the detention room.) He’s trying to put it in the jury’s head, girl.
 

 “THE WITNESS: I know. I can see. They can see it, too.
 

 “Q. BY MR. MANZELLA: Would you answer the question, Miss Brunner?
 

 “THE COURT: Mr.—the Court is now speaking to Mr. Manson, who is in the lockup in the rear, and who just shouted through the opening—
 

 “DEFENDANT MANSON: When is it going to be turn?
 

 “THE COURT:—through the opening ■ in the door. And the Court is telling Mr. Manson that if he continues to shout through the door, if she [«'c he] shouts through the door once more, the Court will order that the small door be closed.
 

 “DEFENDANT MANSON: Where’a all the human rights I’m supposed to have?
 

 “THE COURT: All right. Close it.
 

 “DEFENDANT MANSON: Big businessman.’’
 

 [15]
 

 We agree that the question of paternity may well have had a direct bearing on the credibility of Brunner and the motivation for perjury for or against Manson. However, under our adversary system that is one of the reasons for cross-examination. Manson’s right of cross-examination of Brunner was not abridged or circumscribed in any way. Brunner’s doubt about the paternity was fully disclosed in the transcript of her testimony in
 
 People
 
 v.
 
 Beausoleil, supra,
 
 and was as well known to Manson’s lawyer as it was to the prosecutor.
 

 [16]
 

 The court’s remarks and findings were as follows:
 

 “THE COURT: The Court decides that the motion is not well taken. The motion is predicated on your theory, Mr. Kanarek, that the tape has been altered, and you’ve presented Mr. Berlin and his declaration, but the Court believes that it is a very fanciful motion and it is really not worthy of great consideration. I’ve listened to Mr. Berlin and I believe that he is incorrect. That his memory is faulty. I do not believe—and the Court finds that the tape was not altered. And the Court believes that you have been accorded
 
 *38
 
 the right to listen to this tape. That you have heard the original tape.
 

 “And in addition to that, within the last week you’ve heard the amplified copy of the tape.
 

 “The Court believes and finds that there was no statement made by Ella Jo Bailey. ‘How about my money and my concessions,’ or any similar statement.
 

 “All right, the motion is denied.”
 

 [17]
 

 Penal Code section 182, subdivision 1, reads:
 

 “If two or more persons conspire:
 

 "1. To commit any crime."
 

 [18]
 

 For example, on one occasion Manson yelled at the judge from the detention area. “Fuck you. You dog.” and pounded on the door after it had been closed. The judge always treated Manson with utmost civility and courtesy.
 

 [19]
 

 After the court appointed an additional independent lawyer to confer with Manson. he changed his mind. According to Manson’s statements, the lawyer advised Manson to plead guilty.