[Cite as *State v. Tolbert*, 2022-Ohio-197.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 110249 |
| v. | : | |
| ROMAINE TOLBERT, | : | |
| Defendant-Appellant. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART
AND REMANDED
**RELEASED AND JOURNALIZED:** January 27, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-636261-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Katherine E. Mullin, Assistant Prosecuting
Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and
Stephen P. Hardwick, Assistant Public Defender, *for
appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Appellant Romaine Tolbert ("Appellant") appeals one conviction and

his sentence. Appellant contends that his conviction for involuntary manslaughter

is not supported by sufficient evidence.  We find that the state produced sufficient circumstantial evidence to sustain his conviction.  Appellant also contends that the trial court erred by failing to make the appropriate findings on the record to impose consecutive prison terms.  We agree.  Accordingly, we overrule the Appellant's first assignment of error, sustain the Appellant's second assignment of error and remand for resentencing.

{¶ 2} In August 2017, contractors doing final cleanup at a home located at 12902 Longmead Avenue Cleveland, Ohio discovered human remains inside three large plastic bags. They contacted Cleveland police who secured the scene and photographed the bags, the location and the remains and began an investigation.

{¶ 3} The remains were transported to the office of the Cuyahoga County Medical Examiner. Investigation determined that the remains belonged to a young boy, approximately four years old, and there was evidence of "parry fractures" to both ulnas.  The right ulna break was healed and was remote in time to the death of the child.  The left ulna was broken close in time to the child's death.

{¶ 4} Andrea McCollum, a deputy medical examiner, testified that the remains were a complete skeleton which were placed into anatomic position by a fellow, Dr. Julie Spencer, then employed at the medical examiner's office, prior to examination by Dr. McCollum. According to Dr. McCollum, there was no anatomic cause of death of the child which was ultimately ruled a homicide by unspecified means.  A drug screen was completed but the only compounds found were products

of decomposition. Additionally, the hyoid bone was intact, indicating strangulation was unlikely.

{¶ 5} The state of decay of the remains was sufficiently advanced that no visual identification could be made directly from them. Linda Spurlock, an associate professor of anthropology at Kent State University, was contacted by the Medical Examiner's Office. She was initially asked to determine the age of the child and ultimately, to take the skull of the child to her laboratory to prepare facial art reflecting what the child would have looked like. That drawing was ultimately released to the media in order to solicit information from the public.

{¶ 6} Ashley Makuhan ("Makuhan") was a troubled mother with a serious substance abuse problem. In March 2015, she brought her youngest child, Eliazar Ruiz, to the home of Joanna Vega ("Vega") and Romaine Tolbert and left him there with the family. Vega was Makuhan's best friend growing up.

{¶ 7} Makuhan testified that she last saw Eliazar at a Fourth of July party in 2016. Thereafter, Makuhan attempted to arrange with Vega a meeting between her father, who was visiting from Las Vegas, and Eliazar. Shortly after that party, Vega was unresponsive to messages left by Makuhan and never did give Makuhan's father an opportunity to see Eliazar. Makuhan contacted other friends and relatives of Vega to try to arrange for Eliazar to meet his grandfather. By September 2016, Makuhan threatened legal action to reclaim Eliazar from Vega. However, Makuhan was incarcerated prior to taking any action.

{¶ 8} In June 2017, Makuhan was released from prison and began to contact Vega, calls which were ignored and ultimately blocked. At the time, she was attempting to secure the return of Eliazar. However, Makuhan violated the terms of her release and was reincarcerated in July 2017.

{¶ 9} In December 2017, various news outlets broadcast Spurlock's sketch to the public. Makuhan was then being held in the Northeast Ohio Reintegration Center, saw the sketch and decided that the sketch "looked a lot like my two other kids." She first contacted a jail inspector and indicated her desire to submit a DNA specimen to the detectives on the case. She met with detectives and provided a DNA sample which was used to establish that the remains were those of Eliazar.

{¶ 10} Makuhan reported to the police that she had left Eliazar with Vega and Romaine Tolbert. Police later learned that Tolbert had performed demolition work at the Longmead property where the body had been found.

{¶ 11} Cleveland Police Detective Thomas Lynch interviewed Appellant and recorded his statement. Appellant stated that he drove Eliazar from his house and left him with Tiffany Dunlap (an acquaintance of Makuhan) at Dunlap's home in the area of West 49th Street and Storer Avenue. Appellant also stated that his mother had to drive because his car was not working. That claim was refuted by Sandra Coleman, Appellant's mother, during her testimony.

{¶ 12} Vega corroborated Appellant's initial statement that he, with his mother, drove Eliazar to Dunlap's house. She testified at trial that this story was untrue. She also admitted that she knew it was not true at the time that she

corroborated his statement.  Vega testified that Appellant researched Makuhan's friends on social media and Appellant stated he would "use" Tiffany Dunlap as the person to whom he delivered Eliazar because Dunlap had died from a drug overdose.

{¶ 13} Vega also testified that Appellant told her another version of the night's events while they were in the juvenile court building for a proceeding. Appellant's juvenile court story started the same, with him taking Eliazar to Tiffany Dunlap's home.  But in this juvenile court version, Eliazar died en route from an apparent drug overdose.

{¶ 14} After the body was discovered, and while police conducted the investigation, Makuhan and her family began accusing Appellant and Vega on Facebook with mistreating or kidnapping Eliazar.  In response, a Facebook account purporting to be that of "Christopher Dunlap" started to defend Vega and Appellant.

{¶ 15} Tiffany Dunlap's brother testified that there was no Christopher Dunlap related to Tiffany Dunlap.  The user who registered the Christopher Dunlap account provided the name Raashmir as his purported real name to Facebook to create the account.  Raashmir was the name of a stillborn baby of Joanna Vega and Romaine Tolbert.  Vega further testified that the Appellant showed her the Christopher Dunlap Facebook account and described it as defending her.

{¶ 16} Additionally, Makuhan and her family members began to receive text messages sent by a "burner" phone that only connected via the internet.  The text messages were "cryptic" and "bizarre" including movie quotes and references to Greek mythology.

{¶ 17} Makuhan had shared the text messages she received with a cousin who accused the unknown number of harassing a grieving mother. Both Makuhan and her cousin then received text messages from the same number.

{¶ 18} On January 15, 2019, a Cuyahoga County Grand Jury returned an eleven-count true bill indictment against Appellant.

{¶ 19} That same day, Cleveland police officers responded to a report of suspicious activity at 11606 Castlewood in Cleveland, Ohio. Appellant was suspected of disposing of heavy-duty lawn bags and it was later determined that they contained an assortment of household items. Appellant and Vega left Ohio and went to Michigan. Appellant testified that the reason for relocating to Michigan was that he needed to work to earn bail money.

{¶ 20} Eliazar was born on February 20, 2013 to Ashley Makuhan. Makuhan had a significant substance abuse problem. Additionally, she had significant interaction with the criminal justice system resulting in convictions generally arising out of, or connected to, her drug use. Shortly after Eliazar's birth, Ashley moved to Las Vegas to live with her father. Eventually, Makuhan returned to the Cleveland area and moved in with her grandmother in a house in Lakewood. Shortly after Makuhan moved in, her grandmother was diagnosed with cancer and then moved into a nursing home. When the grandmother moved into the nursing home, she was unable to maintain the rent on the Lakewood house.

{¶ 21} With Makuhan no longer capable of providing housing or care for Eliazar, she gave Eliazar to Vega and her husband, Romaine Tolbert. There was no formal legal custody agreement.

{¶ 22} Eliazar's development was a matter of disagreement in the trial testimony. Generally, his mother's family contends that he was a normal boy and did not have any developmental disabilities. However, his "foster" family testified that he had difficulty with potty control and would occasionally make a mess and smear or track feces in the house. The frequency of this was a matter of contention amongst Vega, Tolbert and their daughters.

{¶ 23} Vega testified that Tolbert was not happy to have all the kids in the house and that he was the disciplinarian and would strike the kids with bare hands.

{¶ 24} Eventually, based on the difficulty of raising Eliazar, Tolbert gave an ultimatum to Vega that either Eliazar had to go or that he would leave. Based on the ultimatum, according to Vega, Tolbert drove Eliazar to a house where Makuhan allegedly was staying.

{¶ 25} Vega also testified that the child had no apparent broken arms when he left her house.

Q. Did this child have any broken arms when he left with [Appellant]?

A. Not as far as I know.

{¶ 26} Appellant testified in his defense. He admitted that his previous statement to the police was untrue. He testified that he had been living alone in an apartment in Shaker Heights, Ohio and received a telephone call from Vega

concerning Eliazar and went to the home. When he arrived, Vega was "hysterical, crying" and escorted him to the basement where he found Eliazar "laying there lips purple and he was dead" but that he attempted to administer CPR. Ultimately, Appellant placed Eliazar's body in plastic bags and placed them on the rear porch of their house. Eventually, he took the body, in the bags, to the property on Longmead.

{¶ 27} Tolbert was found to be guilty by a jury of Count 7, involuntary manslaughter; Count 8, endangering children; Count 9, gross abuse of a corpse; Count 10, tampering with evidence and Count 11, kidnapping. The court sentenced Appellant to 11 years on Count 7, 1 year on Count 9 and 3 years on Count 11 to be served consecutively for an aggregate 15-year sentence.

{¶ 28} The sentences of 3 years on Count 8 and 3 years on Count 10 were ordered to run concurrently to the sentence imposed for Count 7. Appellant was also sentenced to both mandatory and discretionary terms of postrelease control on the various counts.

{¶ 29} Appellant appeals and raises two assignments of error. We overrule Appellant's first assignment of error because there is sufficient circumstantial evidence in the record such that a reasonable juror could have concluded that Appellant endangered Eliazar which proximately caused the death of Eliazar. However, we sustain Appellant's second assignment of error and remand this case for further proceedings consistent with this opinion.

> Assignment of Error No. 1: The trial court erred by convicting Mr. Tolbert of involuntary manslaughter when the evidence was insufficient to convict.

**{¶ 30}** Appellant's first assignment of error only challenges the sufficiency of the evidence as to Count 7, involuntary manslaughter. Appellant contends that this court should vacate his conviction because:

> [T]he state must prove that he caused Eliazar's death as a proximate result of committing the offenses of permitting child abuse, endangering children, or felonious assault * * *. The jury had no information about how Eliazar died[.] * * * As a result, this court should vacate [Appellant's] conviction for involuntary manslaughter.

**{¶ 31}** A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state met its burden of production. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41. When reviewing sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In a sufficiency inquiry, an appellate court does not assess whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25; *Jenks* at paragraph two of the syllabus.

**{¶ 32}** Appellant challenges only his conviction for involuntary manslaughter and only the element of proximate cause. Appellant is correct that that there is no direct evidence as to the cause of Eliazar's death. As a result, the state relied on circumstantial evidence to prove its case.

{¶ 33} Even in the absence of a body, a circumstantial case may be sufficient to support a conviction for homicide. *State v. Nicely*, 39 Ohio St.3d 147, 154, 529 N.E.2d 1236 (1988). *Nicely* rejects the argument that the state must provide a specific hypothesis of how the decedent died. In *Nicely*, the body of the decedent was never recovered. While Eliazar's remains were found it was only after the evidentiary value had severely degraded. "'The fact that a murderer may successfully dispose of the body of the victim does not entitle him to an acquittal. That is one form of success for which society has no reward.'" *Nicely*, 39 Ohio St.3d at 156, quoting *People v. Manson*, 71 Cal. App. 3d 1, 42, 139 Cal. Rptr. 275, 298 (2d Dist. 1977).

{¶ 34} Vega testified that there had been no apparent break to Eliazar's arm when Appellant took him away. A juror could conclude that whatever caused the broken arm also caused Eliazar's death with the alternative being that Eliazar coincidentally suffered a broken arm close in time to his death. The injury and Vega's testimony could support a juror's conclusion that the broken ulna was not caused by an accident. The acts of Appellant following the death of Eliazar further support this conclusion.

{¶ 35} Appellant took action to dispose of the body in a manner that a juror could reasonably conclude was an effort to conceal evidence and demonstrated Appellant's consciousness of guilt. *See Nicely*, 39 Ohio St.3d at 155.

{¶ 36} Thus, the theory of the state was that a reasonable juror could conclude that Eliazar's injury was related to Eliazar's death. The state argues that it

has demonstrated that Appellant had the motive to abuse Eliazar, that he did abuse Eliazar (as intimated by the fractured ulna and Vega's testimony) and that it is probable that Eliazar's death was the result of the abuse committed at the same time.

**{¶ 37}** Ohio courts have upheld convictions under similar facts. *See State v. Lee*, 7th Dist. Mahoning No. 14 MA 120, 2016-Ohio-649, ¶ 61 (child who suffered significant injuries while in the sole custody of the defendant sufficient for conviction for involuntary manslaughter); *State v. Crockett*, 10th Dist. Franklin Nos. 14AP-242 and 14AP-248, 2015-Ohio-2351, ¶ 38 ("appellant contends that the state failed to prove how the injuries were caused because no one observed appellant causing any harm to [the child], appellant was only home alone with [the child] for a short period of time, and that appellant never admitted abuse. Although appellant is correct that the record contains no direct evidence of child abuse, appellant fails to appreciate that his convictions can be sustained based upon circumstantial evidence."); *State v. Henry*, 10th Dist. Franklin No. 04AP-1061, 2005-Ohio-3931, ¶ 34 (again fatally injured child in apartment that the defendant had just left combined with the defendant's lies and evasions to the police sufficient to sustain a conviction for felony murder).

**{¶ 38}** Accordingly, the court overrules Appellant's first assignment of error.

Assignment of Error No. 2: The trial court committed plain error by imposing consecutive sentences without making the findings required by R.C. 2929.14(C).

**{¶ 39}** Appellant's second assignment of error contends that the trial court committed plain error by imposing consecutive sentences without making the

findings required by R.C. 2929.14(C)(4). The trial court sentenced Appellant to 11 years on Count 7; 3 years on Count 8; 1 year on Count 9; 3 years on Count 10; and 3 years on Count 11 with the sentences on Counts 7, 9 and 11 to be served consecutively for an aggregate sentence of 15 years.

{¶ 40} At the sentencing hearing, the judge stated the following:

I will say to both defendants here, okay, and it's been said probably by most of the parties here, when you take care of somebody for the first 30, 60, 90 days of their lives, and carrying them back to your house and care for them and you have a problem with that child and wipe his bottom and clean up the messes that are made. You learn to love that child.

Okay. And the thing that gets me the most, and I don't care if the child was out for a week, a month or a year, and that there was no mention ever from anybody, hey, send me a message, send me picture, send me video, how's he doing, is he going on the potty. Not once was that asked. That to me is very troubling in this case.

And for that reason, the sentences I impose are based upon that.

* * *

I have to give a sentence right here. But you know, when is society going to learn enough? When are we going to get enough to know that these drugs are stomping our community. Everybody involved has some type of drugs involved in this case. There's people that were charged with drugs here, people that were convicted with drugs here, people that use drugs here, people that sell drugs here, everything that has to do with drugs. And this is what happens.

So I have to pronounce the sentence. So I reviewed the presentence investigation, as I said, and I've gone over it. There is a prior record. There's a family that's going to miss you.

* * *

Pursuant to 2929.14(C)(4) of the Ohio [Revised Code], for purposes of overcoming the presumption for concurrent sentences, the court finds this defendant's criminal history shows consecutive terms are needed

to protect the public, there were two or more of the multiple offenses committed as a similar course of conduct, and harm so great or so unusual that a single term does not adequately reflect the seriousness of the conduct.

{¶ 41} Appellant contends that the trial court erred by imposing consecutive sentences without making the specific findings required by R.C. 2929.14(C). The specific issue is that while the court referenced R.C. 2929.14(C)(4) in imposing the consecutive sentences, the court did not make the specific finding that "that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public[.]" R.C. 2929.14(C)(4). It should be noted that there are two findings for this "not disproportionate" provision and the court must find both that the consecutive sentence is not disproportionate to 1) the seriousness of the offender's conduct; and 2) the danger the offender poses to the public. The trial court did include the necessary findings in the journal entry imposing the sentence.

{¶ 42} The Supreme Court of Ohio has found that a trial court must find at the sentencing hearing that the factors of R.C. 2929.14(C)(4) are present and that the failure to do so is reversible error even if the trial court later makes those findings in the sentencing entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 33. In *Bonnell*, the trial court noted the defendant's "atrocious" prison record and also determined that a prison sentence was appropriate. However, there was no express finding that the consecutive sentence was not disproportionate to

the offense. Accordingly, the Supreme Court reversed and ordered the trial court to resentence the defendant.

{¶ 43} "Although the trial court is not required to use 'talismanic words,' it must be clear from the record that it actually made the findings required by statute." *State v. Lariche*, 8th Dist. Cuyahoga No. 106106, 2018-Ohio-3581, ¶ 24.

{¶ 44} The state contends that this court should affirm the judgment of the trial court sentencing Appellant to consecutive sentences because this court has previously affirmed the sentences imposed where the trial court omitted the express "disproportionate" language. However, in *Green* prior to imposing consecutive sentences, the trial court expressly stated: "The court has discretion to impose a consecutive sentence if it's necessary to protect the public and/or punish the offender and it's not disproportionate and makes the following findings under 2929.14(C)(4)[.]" *State v. Green*, 8th Dist. Cuyahoga No. 106116, 2018-Ohio-2729, ¶ 4. Thus, in *Green*, the trial court omitted the specific language, but noted the existence of the proportionality requirement and so established on the record that it clearly understood the requirement and concluded that the requirement was met. *Green*, 2018-Ohio-2729, ¶ 4. The natural conclusion being that the trial court in *Green* found that the sentence was not disproportionate to the offense or need to protect the public.

{¶ 45} This court, as in *Green*, will typically find the required findings present where the trial court discussed at least one of the proportionality findings and also made factual conclusions that would support both required findings. *See*

*State v. Hicks*, 8th Dist. Cuyahoga No. 107055, 2019-Ohio-870, ¶ 14; *State v. Hollis*, 8th Dist. Cuyahoga No. 109092, 2020-Ohio-5258, ¶ 23; *State v. Kamal*, 8th Dist. Cuyahoga No. 109781, 2021-Ohio-2261, ¶ 14 (note the *Kamal* court reversed but only because the journal entry did not include the findings made at the sentencing hearing); *State v. Morris*, 2016-Ohio-7614, 73 N.E.3d 1010, ¶ 27 (8th Dist.); *State v. Bennett*, 8th Dist. Cuyahoga Nos. 108700 and 108749, 2020-Ohio-3453, ¶ 12; *State v. Delmonico*, 8th Dist. Cuyahoga No. 108578, 2020-Ohio-3368, ¶ 59; *State v. Brown*, 8th Dist. Cuyahoga No. 108699, 2020-Ohio-1615, ¶ 15; *State v. Forston*, 8th Dist. Cuyahoga No. 108332, 2020-Ohio-569, ¶ 12.

{¶ 46} However, the cases with facts similar to *Green* are not entirely uniform. *State v. F. F.*, 8th Dist. Cuyahoga No. 107013, 2019-Ohio-455, ¶ 13 (court reversed the sentencing finding that even though the court found the consecutive sentences "not disproportionate" and discussed the seriousness of the offenses and the need to protect the public); *State v. Tidmore*, 8th Dist. Cuyahoga No. 107369, 2019-Ohio-1529, ¶ 11 (trial court stated that the consecutive sentences were "not disproportionate to what you did in this case" but this court reversed); *State v. Squires*, 8th Dist. Cuyahoga No. 108071, 2019-Ohio-4676, ¶ 30 (statement that the sentences were "not disproportionate" was an incomplete finding and so reversed); *State v. Lewis*, 8th Dist. Cuyahoga No. 107875, 2019-Ohio-3660, ¶ 50 (trial court only makes one of the two "not disproportionate" findings and so reversed). Accordingly, the fact that the trial court's sentencing entry makes the appropriate findings is not sufficient.

{¶ 47} This court has also affirmed consecutive sentences where the trial court does not use the exact language of proportionality but nonetheless considered the principle. *See State v. McGowan*, 8th Dist. Cuyahoga No. 105806, 2018-Ohio-2930, ¶ 19 (affirmed trial court where it discussed the need to "try to match the conduct with the sentence"); *State v. Reed*, 8th Dist. Cuyahoga Nos. 108544, 108629 and 108630, 2020-Ohio-1610, ¶ 23 (this court affirmed sentencing where the trial court determined that consecutive sentence would not be disproportionate without using that language).

{¶ 48} These disparate cases cannot be completely harmonized. However, it seems clear that the trial court at the sentencing hearing must make a finding regarding whether the sentence in this case was "not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public[.]" R.C. 2929.14(C)(4). The essential question is whether the record of the sentencing hearing makes it clear that the court considered 1) the seriousness of the offender's conduct and 2) the danger the offender poses to the public and compared those factors to the sentence imposed on the defendant and determined that comparison supported the imposition of the consecutive sentence.

{¶ 49} There is no doubt that the trial court in the sentencing hearing did not expressly refer at any time to whether the consecutive sentence was "not disproportionate" to either the offense of the Appellant or to the likelihood of the Appellant of reoffending.

**{¶ 50}** The trial court did comment on the neglect shown to Eliazar and noted the distressing prevalence of drug use by individuals in this case. However, neither of these statements can be taken as a any sort of comparison between the consecutive sentence and the offense or the likelihood that Appellant would reoffend (the danger posed by the defendant to the public).

**{¶ 51}** Accordingly, the trial court neither expressly found the factors, nor did the trial court find these factors using different language.

**{¶ 52}** We sustain this assignment of error and remand this case to the trial court for resentencing.

**{¶ 53}** Judgment affirmed in part, reversed in part and remanded.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court to carry this judgment into execution. Case remanded to the trial court for resentencing.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

ANITA LASTER MAYS, P.J., and
MARY EILEEN KILBANE, J., CONCUR